CHEMICAL WASTE
MANAGEMENT, INC.

v.

ARMSTRONG WORLD
INDUSTRIES, INC.

Civ. A. No. 85–1703.

United States District Court,
E.D. Pennsylvania.

Sept. 9, 1987.

Wolf, Block, Schorr & Solis-Cohen, Barry M. Klayman, Franklin Poul, Bruce S. Katcher, Philadelphia, Pa., for Chemical Waste Management, Inc.

David D. Wilson, Lancaster, Pa., for Armstrong.

Lee W. Shelly, Holmdel, N.J., for CPS Chemical Co.

George A. Spohrer, Wilkes-Barre, Pa., for Bridon American Corp.

John P. Campbell, Atlanta, Ga., for ITT Grinnell Corp.

Patrick W. Kittredge, Philadelphia, Pa., and Jeffrey G. Huvelle, Washington, D.C., for International Business Machines Corp.

Robert M. Britton, Philadelphia, Pa., for Apollo Metals, Inc.

Mitchell S. Pinsly, Mark N. Cohen, Margolis, Edelstein, Scherlis, Sarowitz & Kraimer, Philadelphia, Pa., for Vineland Chemical Co.

David J. Griffin, Philadelphia, Pa., for Basf-American Corp., Basf Wyandotte Corp. and Basf America Corp.

Denis V. Brenan, Frank M. Thomas, Jr., Marc Durant, Philadelphia, Pa., for Pfizer, Inc.

Patrick T. Ryan, Philadelphia, Pa., for Federal Mogue Corp.

James A. Goodman, Philadelphia, Pa., for Ashland Chemical Co.

Richard M. Pearlman, Alder Cohen & Grigsby, P.C., Pittsburg, Pa., J.W. Montgomery, III, J. Spencer Dreischarf, Cooper Industries, Inc., Houston, Tex., for McGraw-Edison Co.

Frank A. Labor, III, Philadelphia, Pa., William N. Thee, Jr., Troy, Mich., for Armstrong World Ind. Inc., Bridon American Corp., ITT, Grinnell Corp., Federal-Mogul, Corp., Volkswagen of American Inc.

Edward M. Dunham, Jr., Philadelphia, Pa., Miller Marvin Dunham Doering Schreiber & Sloan, for Dabron Corp., Metzval Corp., Lyncott Corp., Lyncott Holdings, Inc., Park L. Metzger, Richard E. Valiga and Lee L. Metzger.

Barry M. Klayman, Philadelphia, Pa., for Waste Management, Inc. and S.C. Holding, Inc.

## OPINION

CAHN, District Judge.

This action was brought under the liability provisions of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9657 (1982).[1] Plaintiff, Chemical Waste Management, Inc. ("Chem Waste"), seeks to recover "response costs"[2] incurred or to be incurred as a result of the release or threatened release[3] of hazardous substances[4] at the Lyncott Landfill in New Milford, Pennsylvania (the "Lyncott facility"). Defendants have moved for summary judgment, arguing that they cannot be responsible for Chem Waste's response costs.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.

P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Movant bears the initial burden of informing the court of the basis for its motion, and indicating the absence of genuine issues of material fact. The nonmoving party must set forth specific facts showing that there is a genuine issue for trial; there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, ——, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, the court must construe the facts and inferences therefrom in the light most favorable to the nonmoving party. *Pollock v. American Telephone & Telegraph,* 794 F.2d 860, 864 (3d Cir.1986).

## I. FACTS

Chem Waste, its parent, Waste Management, Inc. ("Waste Management"), and several of Waste Management's wholly owned subsidiaries are engaged in the industrial, hazardous and chemical waste disposal business. Defendants, generators of hazardous waste, contracted with plaintiff and plaintiff's predecessor, the Stabatrol Corporation ("Old Stabatrol"), for the disposal of industrial waste material.

On November 14, 1980, Waste Management of Pennsylvania, Inc. ("WMPA"), a subsidiary of Waste Management, entered into an asset purchase agreement (the "Purchase Agreement") with Old Stabatrol, the owner and operator ("owner/operator")[5] of the Lyncott facility, and the indi-

1. In 1986, Congress reauthorized and amended CERCLA, providing some clues to the meaning of the 1980 legislation. *See* Superfund Amendments and Authorization Act of 1986, Pub.L. No. 99–499, 100 Stat. 1613. Very little of the new legislation is directly relevant to the issues presented in this case. Therefore, unless otherwise noted, references to CERCLA will be to the unamended codification of the statute at 42 U.S.C. §§ 9601 *et seq.* (1982).

2. *See* 42 U.S.C. § 9607(a)(4)(B) (1982). "Response costs" are those costs incurred in connection with the removal and remedying of a release or threatened release of a hazardous substance. *See id.* § 9601(25).

3. For the definition of "release," *see id.* § 9601(22).

4. For the definition of "hazardous substance," *see id.* § 9601(14).

5. Section 107(a)(1) of CERCLA refers to the "owner *and* operator" of a vessel or facility, *see* 42 U.S.C. § 9607(a)(1) (emphasis added); section 107(a)(2), however, refers to any person who "owned *or* operated" a facility, *see* 42 U.S.C. § 9607(a)(2) (emphasis added). Because there is no dispute that Chem Waste and its predecessor meet both the conjunctive and disjunctive standards, the court has adopted the term "own-

vidual shareholders (the "Metzval parties") of 1533 North Fletcher Corporation, the sole shareholder of Old Stabatrol. WMPA acquired all the assets, rights, properties, and business of Old Stabatrol. These comprised, *inter alia,* all of the waste disposal contracts of Old Stabatrol, including those with the defendant generators, the business and trade name of "Stabatrol Corporation," all waste disposal facility permits and licenses, and all subsidiary corporations. After the sale, the Stabatrol Corporation became a wholly owned subsidiary ("New Stabatrol") of Chem Waste. Old Stabatrol changed its name to the Metzval Corporation and subsequently was dissolved.

The Purchase Agreement expressly provided that "Buyer shall not be liable for any of [Old Stabatrol's] past, present or future debts, obligations or liabilities of any kind, whether accrued, absolute, contingent, or otherwise," except for:

a. All liabilities set forth on [Old Stabatrol's] Consolidating Balance Sheet dated August 31, 1980....

b. All liabilities of [Old Stabatrol] arising in the ordinary course of business since August 31, 1980 through the date of closing hereof, all of which in the aggregate are not material [sic] adverse to [Old Stabatrol].

c. Tax liability incurred through depreciation recapture caused by this transaction.

d. Tax liability incurred through investment credit recomputation caused by this transaction.

Exhibit 1 at 5 and Schedule H, Appendix of Documents in Support of the Motion for Summary Judgment by the Coalition Defendants and Vineland Chemical Company ("Defendants' Exhibits").

During the negotiations and in the Purchase Agreement, Old Stabatrol represented that the Lyncott facility was operating in full compliance with state and federal laws. In addition, prior to the acquisition, Waste Management examined the waste disposal permits and engineering plans of the facility and conducted several on-site inspections. At the time of the purchase, construction on two of the three disposal vaults had not been completed, and substantial work remained to be completed on all vaults. Defendants' Exhibit 6 at 8–10. The engineers of Waste Management concluded that, although there were some problems that might contribute to the operating costs, the design and construction of the facility appeared to be adequate.

Shortly after the acquisition, inspectors from the Pennsylvania Department of Environmental Resources ("DER") identified several violations of the DER permit and Pennsylvania environmental laws, including:

(1) On November 21, 1980, the DER observed damaged drums containing arsenic salts being placed in Vault 1, and observed arsenic waste spilled on the floor;

(2) On November 21, 1980, the DER observed that waste material in Vault 3 had been permitted to mix with water and flow from the vault over the surface soils;

(3) On December 4, 1980, the DER inspectors observed water in monitoring sumps; and

(4) On December 15, 1981 [sic], Chem Waste accepted wastes from Rockwell International, contrary to the DER's conditions of approval.

Defendants' Exhibit 2 at 1–2.

In March of 1981, the DER suspended the Lyncott facility's permit and ordered corrective action. Following the March order, DER inspectors continued to observe violations at the site, including Chem Waste's failure to implement all of the corrective actions ordered by the DER. The inspectors later concluded that the vaults were not constructed in accordance with the designs approved by the DER. The DER therefore issued a second order on September 4, 1981, which prescribed removal of all wastes from the site and submission of a Closure/Post-Closure Plan for the site. Chem Waste continued to refuse to comply with the DER orders. As a result, the DER suspended Chem Waste's

er/operator," which has been used throughout this case.

hazardous waste transporter license and refused to approve permits and licenses for other Chem Waste waste disposal businesses in Pennsylvania. In August of 1982, the DER filed an action in state court to enforce its September 4, 1981 order. On September 28, 1984, Chem Waste entered into a settlement agreement with the DER whereby the DER agreed to discontinue denying permits and licenses to Chem Waste's other facilities if Chem Waste implemented the DER orders.

In June 1981, New Stabatrol commenced an action in the United States District Court for the Middle District of Pennsylvania against Old Stabatrol and the Metzval parties to rescind the Purchase Agreement on the grounds of fraud and misrepresentation. When this action failed to proceed quickly, Waste Management and Chem Waste commenced a second action in state court. The parties eventually settled all pending and potential claims. Although Waste Management rescinded the Purchase Agreement, the settlement agreement provided for, *inter alia*, Waste Management's maintenance of the Lyncott facility in compliance with the DER stipulation between Chem Waste and the DER (the "Maintenance Agreement").

In March of 1985, Chem Waste commenced this action against defendants.

## II. DISCUSSION

Section 107 of CERCLA provides in pertinent part:

(a) Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous wastes were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other

party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances ...

(4) ... shall be liable for—

(A) all costs of removal or remedial action incurred by the United States Government or a State not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan....

42 U.S.C. § 9607 (1982).

Chem Waste argues that § 107 explicitly authorizes the recovery of response costs from defendants. There is, of course, no dispute that defendants are hazardous waste generators for the purposes of § 107(a)(3), 42 U.S.C. § 9607(a)(3) (1982), or that Chem Waste is an owner/operator within the meaning of § 107(a)(1), 42 U.S.C. § 9607(a)(1) (1982). Thus, unless defendants can present a viable defense to Chem Waste's claims, defendants' motion must fail.

In the face of CERCLA's expansive liability provisions, defendants have presented seven arguments why they should not be held liable for response costs incurred or to be incurred in connection with the Lyncott facility. The court shall address these arguments *seriatim*.

A. *May the Owner and Operator of a RCRA Facility Recover CERCLA Response Costs?*

 Defendants contend that, because the Lyncott facility was an "interim status facility" under § 3005(e) of the Resource Conservation and Recovery Act ("RCRA"), P.L. 94–580, 90 Stat. 2795, 42 U.S.C. § 6925(e) (1982), defendants cannot recover CERCLA response costs. RCRA and regulations promulgated in connection with the statute require owners and operators of RCRA facilities, *inter alia*, to inspect and maintain the facility, remedy any deterioration or malfunction in the facility, and close the facility to prevent or minimize the escape of hazardous materials. *See* 40 C.F.R. §§ 265.15(c), 265.31, 265.111 (1980). Re-

lying upon these regulations, which were applicable to Chem Waste in November 1980, defendants argue that Chem Waste may not recover CERCLA response costs because to permit such recovery would render RCRA a nullity. Defendants further contend that CERCLA's plain language, legislative history, and policy underpinnings support their position.

Although there is some merit to defendants' arguments, the court finds that the better-reasoned approach is that adopted by the court in *Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F.Supp. 1049 (D.Ariz. 1984), *aff'd*, 840 F.2d 1454 (9th Cir.1986), where the court held that RCRA does not preempt CERCLA. CERCLA's preemption provision, placed prominently at the beginning of the statute's liability provision, states that, subject to certain defenses not relevant here, liability shall attach "[n]otwithstanding any other provision or rule of law...." 42 U.S.C. § 9607(a) (1982).

Defendants argue further that Congress intended CERCLA to apply only to *abandoned* hazardous waste facilities and RCRA to apply only to *active* facilities. CERCLA's statutory language, however, belies such a contention. First, § 101(20)(A) of CERCLA differentiates between a "facility" and an "abandoned facility." *See* 42 U.S.C. § 9601(20)(A). By this language, Congress clearly evinced its intent that CERCLA apply to both active and abandoned facilities. Second, Congress distinguished RCRA sites when it deemed such differentiation important. In § 103(c) of CERCLA, for example, Congress exempted from notice requirements owner/operators who have been issued permits or been accorded interim status under RCRA. *See* 42 U.S.C. § 9603(c) (1982). The liability provisions of CERCLA, however, which are at issue here, contain no exemption for RCRA owner/operators. *See* 42 U.S.C. § 9607; *Mardan*, 600 F.Supp. at 1054. Thus, defendants' statutory language argument must fail.[6]

Finally, defendants argue that the policies underlying CERCLA mandate a decision in their favor. In urging their position, defendants explore a parade of horribles and conclude that a decision in Chem Waste's favor would detract from the statute's efficacy and would, in fact, spur a rash of *illegal* hazardous waste disposal. The court finds these arguments unpersuasive.

Defendants' policy arguments must fail because permitting RCRA owner/operators to recover CERCLA response costs from generators actually *promotes*, rather than detracts from, CERCLA's policies. First, an owner/operator that knows it can seek contribution from a generator will promptly clean-up a hazardous waste site. Defendants argue, though, that Chem Waste did not provide a prompt clean-up at the Lyncott facility, and that such inaction belies Chem Waste's argument that permitting owner/operators to recover response costs provides an incentive for prompt clean-up. Although it appears Chem Waste was less than diligent in its efforts at the Lyncott facility, defendants' argument is without merit: it was unclear at the time of the Lyncott clean-up that potentially responsible owner/operators could re-

---

6. Similarly, the parties' arguments based upon CERCLA's legislative history are not dispositive of this issue. CERCLA's legislative history is sparse and generally uninformative.

CERCLA was enacted hastily and is the product of political compromise. Moreover, last-minute additions and deletions to the statute render its legislative history of little practical use. *See generally* Senate Committee on Environment and Public Works, 97th Cong., 2d Sess., A Legislative History of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (Superfund) (Comm. Print 1983); *see also Exxon Corp. v. Hunt*, 475 U.S. 355, 106 S.Ct. 1103, 89 L.Ed.2d 364 (1986) (reviewing CERCLA's legislative history).

Although CERCLA's legislative history is uninformative with respect to specific questions, the court finds that Congress expressed its major policy goals quite clearly. Thus, the statute's objectives are the following: to encourage maximum care and responsibility in the handling of hazardous waste; to provide for rapid response to environmental emergencies; to encourage voluntary clean-up of hazardous waste spills; to encourage early reporting of violations of the statute; and to ensure that parties responsible for release of hazardous substances bear the costs of response and costs of damage to natural resources.

cover response costs from generators. Defendants cannot argue that response costs are unavailable to owner/operators and in the same breath suggest that Chem Waste was dilatory even though response costs *were* available to owner/operators. Second, permitting owner/operators to recover response costs from waste generators is consistent with CERCLA's goal of spreading the costs of environmental disasters. A theme running throughout CERCLA's legislative history is that all parties involved in hazardous waste disposal must share the costs thereof. Although parties may under certain circumstances "contract out" of CERCLA liability, *see* 42 U.S.C. § 9607(e)(2) (1982), an owner/operator presumably would take such a shifting of risks into account by charging waste generators a higher fee for hazardous waste disposal. Such an arrangement would fulfill Congress' intent that parties responsible for the release of hazardous substances bear the costs of response and costs of damage to natural resources.

In sum, the court holds that RCRA and its regulations do not preclude a RCRA owner/operator from recovering CERCLA response costs.

### B. May a "Liable Party" Under CERCLA Maintain a Suit for Response Costs Under § 107 of CERCLA?

■ In the face of statutory language that appears clearly to permit any person to recover its response costs from owners, operators, owner/operators, transporters, and generators, defendants argue that Chem Waste, as a potentially responsible party ("PRP"), may not recover such costs. Defendants base their argument on recent amendments to CERCLA, and it would seem, upon the equitable doctrine of "unclean hands."[7] The court finds both of these bases without merit and therefore holds upon this ground as well that Chem Waste may pursue its claim for response costs.

Defendants maintain that the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613, clarify that a PRP may not maintain a suit to recover response costs. Rather than supporting defendants' position, however, amended § 113(f) makes quite clear that a PRP *may* maintain an action against another PRP.[8] That section provides in pertinent part:

> *Any person* may seek contribution from *any other person who is liable* or potentially liable under Section 9607(a) of this title, during or following any civil action ... under section 9607(a) of this title.... Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 106 or section 107.

42 U.S.C. § 9613(f)(1) (1982) (emphasis added). This subsequent statutory enactment gives the court guidance in construing the earlier statute and is therefore entitled to great weight. *See Red Lion Broadcasting Co. v. Federal Communications Commission,* 393 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 21 L.Ed.2d 601 (1969). The clear significance of the word "other" in § 113(f) is that a PRP may maintain a suit for contribution against *another* person who is or may be liable for response costs. To read the statute in any other manner would be to read language out of the statute, an activity that this court must not undertake absent some direction from Congress.

Also supportive of Chem Waste's position on this issue is *Sand Springs Home v. Interplastic Corp.,* 670 F.Supp. 913 (N.D. Okla.1987) where the court found that "a private party, even though a responsible party under CERCLA, who voluntarily pays CERCLA response costs may bring an action in its own behalf to collect cleanup

---

7. The court previously has stated that the "unclean hands" doctrine espoused in *Mardan Corp. v. C.G.C. Music, Ltd.,* 600 F.Supp. 1049, 1057 (D.Ariz.1984), *aff'd,* 804 F.2d 1454 (9th Cir. 1986), has no place in CERCLA actions. *See* Transcript of Argument of December 12, 1986,

at 22. To the extent defendants are attempting to resurrect their argument that Chem Waste's "unclean hands" bar it from pursuing CERCLA response costs, their contentions are rejected.

8. *See supra* footnote 1 (discussing SARA).

costs against the parties allegedly responsible for the production and dumping of hazardous waste." *Id.* at 916. Defendants attempt to distinguish this case by revisiting their argument that a RCRA owner/operator may not recover CERCLA response costs. The court already has found, however, that this argument is of little merit. Defendants also suggest that *Sand Springs* is inapposite because the plaintiffs in that case were "innocent landowners"[9] who voluntarily remedied a hazardous situation, while Chem Waste and its predecessor contributed to the hazardous condition at the Lyncott facility and did not voluntarily undertake clean-up efforts at the site. Even assuming defendants' premises are correct, the court nevertheless holds that a PRP may recover response costs from another PRP. Defendants' arguments concerning "innocence" and "fault" are relevant only to the *amount* of response costs that Chem Waste may recover.[10]

### C. Is Chem Waste Precluded by Contract From Recovering Response Costs Under CERCLA?

Defendants contend that Chem Waste assumed or succeeded to Old Stabatrol's liabilities for the Lyncott facility. Relying upon this contention, defendants then argue that Chem Waste is precluded by contract from recovering response costs under CERCLA.

### 1. Did Chem Waste Assume or Succeed to Old Stabatrol's Liabilities for the Lyncott Facility?

Defendants argue that Waste Management and Chem Waste are responsible for Old Stabatrol's liabilities because: (a) Chem Waste expressly assumed Old Stabatrol's liabilities; and (b) the Old Stabatrol acquisition was a merger of Old Stabatrol into Chem Waste whereby Chem, Waste continued Old Stabatrol's business and assumed Old Stabatrol's liabilities.

The court assumes for the purpose of this motion that Chem Waste did assume or succeed to Old Stabatrol's liabilities for the Lyncott facility.[11] Based upon the analysis that follows, however, the court will deny defendants' motion on this point.

### 2. Is Chem Waste Precluded by Warranty or Indemnity from Recovering CERCLA Response Costs?

Defendants contend that Chem Waste assumed Old Stabatrol's Waste Disposal Contracts and is precluded by the express and implied terms of those contracts from recovering response costs under CERCLA. Defendants also argue that Chem Waste itself contracted with generators, and that express and implied provisions of these contracts preclude Chem Waste's suit.

#### a. Warranty

Relying upon a tentative ruling of the court, defendants contend that Chem

**9.** Defendants argue that Judge Ditter's opinion in *City of Philadelphia v. Stepan Chemical Co.,* 544 F.Supp. 1135 (E.D.Pa.1982), impliedly precludes owner/operators who were not "innocent purchasers" from recovering CERCLA response costs. The court disagrees. Nowhere in his opinion does Judge Ditter make such a statement. Moreover, because the plaintiff in *Stepan* was an innocent purchaser, Judge Ditter did not need to reach the question presently before this court.

**10.** Defendants argue, time and again, that Chem Waste would be made whole—or might even reap a profit—were it permitted to recover CERCLA response costs from defendants. Such an argument misses the mark: defendants assume that Chem Waste could recover all of its response costs from the waste generators. But, as the court has stated repeatedly, the degree of recovery by an owner/operator should depend on many factors. Thus, Chem Waste's alleged failure to comply with RCRA might substantial-

ly reduce its recovery of response costs; such failure should not, however, bar Chem Waste's cause of action *ab initio.*

The extent of an owner/operator's recovery of response costs should also depend upon: the owner/operator's relative fault, the volume of waste deposited, and the relative toxicity of such waste. *See* SARA § 113(f), 42 U.S.C.A. § 9613(f) (West Supp.1987) ("In resolving contribution claims the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate.")

**11.** Because a jury must decide the proper apportionment of damages, if any, between Chem Waste and the various defendants, the issue of whether Chem Waste is a "successor" to or "continuation" of Old Stabatrol is more suitable for presentation to the jury. Accordingly, the court does not reach this issue. Nor does the court decide whether Chem Waste expressly assumed Old Stabatrol's liabilities.

Waste may not recover response costs from its generators because the "essence" of the various waste disposal contracts was that the owner/operator would dispose of the hazardous waste in a safe, legal manner and would charge but a single fee for this service. According to defendants, Chem Waste's suit for response costs is an attempt to charge the generators a second fee for a service that Chem Waste and its predecessor performed improperly. Defendants argue that Chem Waste expressly and impliedly warranted the safe, legal disposal of the generators' waste, and that basic contract law therefore precludes Chem Waste from recovering CERCLA response costs from the generators.

■ Section 107(e)(2) of CERCLA provides that:

Nothing in this subchapter, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation or otherwise against any person.

42 U.S.C. § 9607(e)(2) (1982). Defendants contend this "language makes clear that the liability provisions of CERCLA do not abrogate contractual rights." Memorandum of Law in Support of the Motion for Summary Judgment by the Coalition Defendants and Vineland Chemical Company ("Defendants' Memorandum") at 72. Although it is debatable whether any provision of CERCLA is "clear," the court agrees that in this private suit for response costs, CERCLA's liability provisions do not abrogate the parties' contractual rights. Accordingly, the court shall first determine whether Chem Waste or its predecessor expressly warranted the safe, legal disposal of the generators' waste.[12]

■ Defendant Armstrong argues that its contract, executed in February of 1981, precludes Chem Waste's recovery of re-

sponse costs. Armstrong also asserts that it "had previously contracted with Old Stabatrol, and the Waste Management contract reaffirmed the terms of Armstrong's prior Agreement with Old Stabatrol." Defendants' Memorandum at 74. By not supplying a copy of its contract with Old Stabatrol, Armstrong apparently asks the court to assume that the terms of the contract were the same as those of the later contract, which Armstrong has provided the court. This we cannot do; there exists a clear issue of material fact, and summary judgment is therefore inappropriate. Summary judgment is no more proper with respect to waste disposed of pursuant to the February 1981 contract. In a cover letter to New Stabatrol, Armstrong stated that it had modified the proposed waste disposal agreement and that "[i]f you are in agreement, please send us a signed copy of the revised contract and a copy of this letter signed at the appropriate place below; upon receipt we will consider the contract to be effective." Defendants' Exhibit 54. If such a signed copy exists, Armstrong has not produced it for the court. Thus, it is unclear whether Armstrong even had a contract with New Stabatrol, and summary judgment is therefore inappropriate.

■ Defendant Pfizer contends that it cannot be liable for CERCLA response costs because its standard form purchase order, issued to Old Stabatrol on November 8, 1979,[13] provided that "all articles, work, and services supplied hereunder, which are so required, will be in compliance with . . . all other applicable Federal, State and Local laws." Defendants' Exhibit 55. Pfizer admits, albeit in a footnote, that the purchase order submitted to the court is not the actual purchase order sent to Old Stabatrol: "Pfizer does not possess the purchase order, which was *apparently* sent to Old Stabatrol. However, a copy of the reverse side of a *similar* Pfizer purchase

---

**12.** Because Chem Waste has advised the court that Chem Waste and defendant Ashland have settled their case, the court shall not explore the terms of Ashland's waste disposal contracts.

**13.** Pfizer has submitted to the court no agreement between Chem Waste and Pfizer. Accordingly, summary judgment cannot be entered with respect to any waste received after Waste Management purchased the Lyncott facility.

order form is submitted as page 4 of Exhibit 55." Defendants' Memorandum at 75 n. 17 (emphasis added). It is beyond peradventure that summary judgment is inappropriate where the documents relied upon are of such a speculative nature. Accordingly, defendant Pfizer's motion on this basis must be denied.

Defendants Vineland and CPS have submitted to the court no waste disposal agreements with Vineland and Chem Waste or its predecessor. Thus, the court cannot hold that Chem Waste or its predecessor expressly warranted to Vineland or CPS the safe, legal disposal of their hazardous waste.

In sum, defendants have failed to prove that their contracts with Chem Waste or its predecessor *expressly* preclude Chem Waste from recovering CERCLA response costs from defendants.

■ Defendants also argue that Chem Waste and its predecessor *impliedly* warranted the safe, legal disposal of defendants' waste. As noted previously, at argument on December 12, 1986, the court tentatively ruled that an owner/operator in the business of operating a hazardous waste facility could not recover CERCLA response costs from a waste generator that contracted with the owner/operator for disposal of hazardous waste.[14] Upon further reflection and research, however, the court has concluded that Congress intended that *all* parties involved in hazardous waste disposal be responsible for the clean-up of hazardous waste releases. In exceptionally broad language, Congress provided that owner/operators, generators, and transporters *"shall be liable for ...* any necessary costs of response incurred by *any other person* consistent with the national contingency plan...." 42 U.S.C. § 9607(a) (1982) (emphasis added). CERCLA's plain language thus permits an owner/operator to sue a generator of hazardous waste. As discussed *supra,* two of CERCLA's primary objectives are the prompt clean-up of

leaking hazardous waste sites and the provision of effective incentives for the careful handling of hazardous wastes in the future. One means of achieving these objectives is to "spread the risks" of liability among *all* parties involved in hazardous waste disposal. Were the court to rule that implied in every waste disposal contract is a warranty by the owner/operator that it will not seek to recover CERCLA response costs from the waste generator, this court would engage in judicial legislation that would reshape CERCLA's liability scheme. This we cannot do. Accordingly, the court holds that, absent an express contractual provision to the contrary, an owner/operator in the business of operating a hazardous waste facility may recover from generators of waste deposited at the facility any necessary costs of response incurred or to be incurred by the owner/operator in connection with a release or threatened release of hazardous substances at the facility.

### b. *Indemnity*

Defendants also argue that Chem Waste may not recover response costs from defendants because Chem Waste and its predecessor expressly and impliedly agreed to indemnify defendants for any losses incurred in connection with waste deposited at the Lyncott facility.

■ Section 107(e)(1) of CERCLA provides that:

No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section, to any other person the liability imposed under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1) (1982). Defendants contend, and the court agrees, that this

---

**14.** The court's tentative ruling was based upon a common sense understanding of contract law: a party who provides a service for a fee may not extract a second fee from his client merely because the provider performed the service improperly and was held liable for damages as a result thereof.

language authorizes indemnity agreements between owner/operators and generators. *See Caldwell v. Curley Refining Co.,* 755 F.2d 645 (8th Cir.1985) (permitting lessor of dumping site to seek indemnity from lessee of site). Only one of the defendants,[15] Armstrong, argues that Chem Waste's predecessor expressly indemnified the defendant against all harm in connection with the disposal of waste at the Lyncott facility. Armstrong relies upon the same contracts discussed in part "a," *supra.* The court need not explore the language of these contracts, however, because Armstrong has not proved to the court that it ever contracted with Old Stabatrol, and it is unclear that Armstrong's agreement with New Stabatrol ever came into effect. Accordingly, Armstrong's motion on this point must be denied.

◾ Defendants also argue that Chem Waste and its predecessor *impliedly* indemnified generators of waste deposited at the Lyncott facility. In light of the court's holding concerning the implied warranty issue, however, defendants' argument must fail here as well. Congress has enacted a broad statute, and the policies underlying that statute are clear. If owner/operators and generators wish to redistribute the risks distributed by Congress, they must do so clearly and unequivocally.

### D. Does CERCLA Impose Successor Liability Upon Waste Management and Chem Waste?

Defendants posit, albeit in uncharacteristically brief fashion, that a current owner of a hazardous waste facility succeeds to the liabilities of its predecessor. Although defendants are correct to a certain extent, the implications of their argument prove too much. Thus, the court will deny their motion upon this ground.

◾ Section 107 of CERCLA, 42 U.S. C. § 9607, imposes strict liability for the clean-up of leaking hazardous waste sites upon four categories of PRPs: (1) the current owner and operator of a hazardous waste site; (2) the owner or operator at the

time the waste was deposited at the site; (3) generators of waste sent to the site; and (4) transporters of waste sent to the site. The law is clear that these four categories of PRPs are jointly and severally liable for the clean-up of a leaking hazardous waste site. *See, e.g., Colorado v. AS-ARCO, Inc.,* 608 F.Supp. 1484, 1489 (D.Colo.1985); *United States v. Wade,* 577 F.Supp. 1326, 1338 (E.D.Pa.1983). CERCLA does not, however, prohibit a PRP from seeking contribution from other PRPs. Indeed, the contrary is true. *See, e.g., United States v. New Castle County,* 642 F.Supp. 1258, 1269 (D.Del.1986). Any other result would be both unjustified and unjust in that a single PRP would bear the *entire* cost of clean-up while other PRPs escaped all liability. CERCLA's legislative history demonstrates that Congress did not intend such a result. Accordingly, this court cannot, as a matter of law, require Chem Waste to bear the entire cost of clean-up at the Lyncott site.

### E. Is Chem Waste Equitably Estopped From Denying Its Liability for Lyncott Response Costs?

◾ Defendants contend that Chem Waste is equitably estopped from denying its liability for Lyncott response costs because it failed to disclose to defendants problems encountered at the Lyncott facility. Defendants also allege that Chem Waste represented that it would ameliorate the conditions at the Lyncott facility, and that defendants relied upon these representations. Chem Waste responds that defendants confuse equitable estoppel and promissory estoppel, fail to demonstrate the elements of estoppel, and fail to eliminate issues of material fact. Because the court agrees that there are in dispute several material issues of fact, summary judgment cannot be granted upon this ground.

### F. Does Chem Waste's Prior Litigation with the Metzval Parties Bar Chem Waste's Claim?

◾ Defendants argue that the dismissal with prejudice of Chem Waste's suit

---

**15.** Defendant Ashland's contract with Old Stabatrol also contained an indemnity provision. The court need not address this provision, however, because Chem Waste and Ashland have settled. *See supra* footnote 12.

against the Metzval parties is *res judicata* to the present action. As Chem Waste points out, defendants can assert only that Chem Waste is *claim* precluded, not *issue* precluded, by the dismissal of the earlier case. This is so because no issues were fully and fairly litigated by virtue of the dismissal with prejudice, and the judgment "was unaccompanied by findings and hence did not bind the parties on any issue." *See Gambocz v. Yelencsics*, 468 F.2d 837, 842 (3d Cir.1972).

Three elements are necessary to a finding of *res judicata:* (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same causes of action. *United States v. Athlone Industries, Inc.*, 746 F.2d 977, 983 (3d Cir.1984) (citations omitted). Chem Waste asserts, and the court agrees, that defendants have not borne their burden of proof with respect to the second and third elements of this standard. Accordingly, summary judgment on this ground must be denied.

First, and foremost, there is no identity of parties or their privies in the initial action and the instant case. In the first action Chem Waste sued the Metzval parties; in this action, Chem Waste has sued generators of waste deposited at the Lyncott facility, none of which was a party or in privity with a party to the first action. Defendants attempt to overcome this hurdle by asserting that the Court of Appeals for the Third Circuit has broadened the availability of *res judicata* to persons who might have been, but were not, named in the initial action. *See Bruszewski v. United States*, 181 F.2d 419 (3d Cir.), *cert. denied*, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950). Thus, defendants argue, *res judicata* prohibits Chem Waste "from asserting essentially the same claim against different defendants." *See Gambocz*, 468 F.2d at 841; *Bruszewski*, 181 F.2d at 422; *Avins v. Moll*, 610 F.Supp. 308, 316 (E.D. Pa.1984), *aff'd*, 774 F.2d 1150 (3d Cir.1985).

The court therefore must determine whether the "claims" Chem Waste asserted against the Metzval parties are essentially the same as the claims asserted in the instant case. This inquiry turns on the third *res judicata* factor: whether the subsequent suit is based on the same causes of action. In *United States v. Athlone Industries, Inc.*, 746 F.2d 977 (3d Cir.1984), the court of appeals set forth a four-factor test for determining when suits involve the same cause of action:

(1) [W]hether the acts complained of and the demand for relief are the same (that is, whether the wrong for which redress is sought is the same in both actions); (2) whether the theory of recovery is the same; (3) whether the witnesses and documents necessary at trial are the same (that is, whether the same evidence necessary to maintain the second action would have been sufficient to support the first); and (4) whether the *material* facts alleged are the same.

*Id.* at 984.

Applied to the instant case, the *Athlone* factors lead to the conclusion that the causes of action in the Metzval cases were different from the causes of action asserted in the case at bar. In the Metzval cases, the wrong asserted concerned misrepresentations in connection with the sale of the Lyncott facility, and the relief demanded included reformation or rescission of the Purchase Agreement, restitution, and money damages; the theories of recovery included violations of securities laws, fraud and misrepresentation, and breach of contract; and the witnesses and documents at trial would have concerned the sale of the Lyncott facility. In stark contrast, the wrong asserted in the instant case concerns the generation of waste released at the Lyncott facility, and the relief demanded is damages for the clean-up costs incurred or to be incurred by Chem Waste; the theory of recovery is joint and several liability under CERCLA; and the witnesses and documents at trial will concern the nature and quality of waste sent to the site by the generator defendants, and the necessity and appropriateness of the clean-up activities undertaken.

In sum, the causes of action asserted against the Metzval parties were different from the causes of action asserted in the

instant case.[16] *Res judicata* does not bar Chem Waste's suit for CERCLA response costs against the hazardous waste generators.

### G. *Are the Generators Third Party Beneficiaries of the Maintenance Agreement?*

Defendant CPS Chemical argues that defendants are third party beneficiaries of the Maintenance Agreement. Citing *American Jurisprudence* 2d, CPS acknowledges that "the doctrine of contractual third party beneficiaries traditionally requires an intent to confer benefit." The Maintenance Agreement, however, states that it is *"not* intended to confer any benefit, or impose any obligation, upon any other person, firm, corporation, DER, EPA, any court or administrative body of competent jurisdiction...." Maintenance Agreement ¶ 6 at 6 (emphasis added). Thus, the plain language of the document precludes the granting of summary judgment upon this ground: at the very least, there exists a genuine dispute as to the parties' intent.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is denied. The court has concluded, however, that this matter involves a controlling question of law as to which there is a substantial ground for difference of opinion, and an immediate appeal may materially advance the ultimate termination of the litigation.

An appropriate order follows.

---

**16.** Defendants argue that, even if Chem Waste did not sue the Metzval parties under CERCLA, Chem Waste's claims against the Metzval parties were essentially the same as the claims in the instant case. Chem Waste sought from the Metzval parties: "reimbursement for the cost of correcting the violations, events and conditions at the waste disposal sites contemplated in the [Purchase] Agreement...." Defendants' Exhibit 35 at 33.

The court finds that this citation from the counterclaim asserted against the Metzval par-

ties provides scant support for defendants' position that the causes of action in the Metzval litigation were the same as those in the case at bar.

The court also rejects defendants' argument that Chem Waste already has received full satisfaction of its claim. Defendants' contentions on this point fail to eliminate all genuine disputes of material fact, and summary judgment therefore is inappropriate.