**UNITED STATES of America**

**v.**

**Thomas K. BILLS, M.D., Appellant.**

**No. 86–5586.**

United States Court of Appeals,
Third Circuit.

Argued Feb. 23, 1987.

Decided June 25, 1987.

---

Gail R. Henningsen (argued), Lenox, Giordano, Devlin, Delehey & Socey, Trenton, N.J., for appellant.

William S. Halsch (argued), Asst. U.S. Atty., Thomas W. Greelish, U.S. Atty., Newark, N.J., for appellee.

Before WEIS, BECKER and VAN DUSEN, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this appeal, we conclude that defendant physician breached his contract with the government in which he agreed to provide professional services in exchange for a scholarship to complete his medical studies. We will affirm the district court's entry of summary judgment to that extent. We will remand for a recalculation of damages, however, because the government refuses to credit the time defendant spent in biomedical research despite a provision in the statute requiring that result.

The district court entered summary judgment for plaintiff in the amount of $141,-656.58. The judgment represents an award of three times the amount the government granted defendant, plus interest, to complete two years of his medical education under the provisions of the National Health Service Corps Scholarship Program. 42 U.S.C. § 254l. Defendant has appealed.

Medical students who participate in this program agree to provide their services in health manpower shortage areas after completing professional training in return for the scholarship and stipend support received while in school. The length of obligated service equals either the number of years during which the student received aid from the government or two years, whichever is greater. In the event the student fails to provide the required service, the student becomes liable for treble damages.

Defendant signed a contract setting forth his rights and duties with the Secretary of Health and Human Services. It included a provision that allowed a deferment, not to exceed three years, for beginning the obligated post-graduate service.

In June 1979, at the end of his third year of medical school, defendant received a form letter from the Secretary stating that all physicians "must request deferment for and complete" a flexible first year residency in family practice, internal medicine or pediatrics. In the alternative, a scholarship recipient could request deferment for a clinical residency that could be completed within three years. The letter cautioned the reader to consider these conditions before making any post-graduate commitments.

On October 30, 1979, a similar letter was sent to defendant adding a third choice for post-graduate training—a residency in obstetrics, gynecology or psychiatry. The letter advised that if students desired to enter a surgical internship, they should "pursue only a flexible year of training ..., serve [their] obligation, and then complete specialty training." Applications for this deferment were to be submitted between March 1, and April 30, 1980.

Additional correspondence followed. A third letter dated March 3, 1980, relayed essentially the same information. A "Notification of Approved Deferment," dated April 1, 1980, and addressed to defendant, informed him that his obligation would be deferred for one year to complete a flexible first-year program that included residencies in family practice, internal medicine or pediatrics. The notice also warned that failure to complete the one-year assignment would be considered "cause to invoke the default penalties described in the Scholarship Program Contract [treble damages]."

Despite that notification, defendant wrote to the Secretary on April 9, 1980, requesting a postponement of his service obligation. In that letter, defendant stated he had accepted a position in an orthopedic surgery department requiring a minimum commitment of five years. He also mentioned his intention to enter the National Research Service Award program.

Three weeks later, the Secretary denied the five-year deferment and reminded defendant that orthopedic surgery was ex-

cluded from the specialties qualifying for such consideration. The Secretary was noncommittal about the Research Service proposal, observing that neither the defendant's qualifications nor interest would guarantee receipt of an award. The letter concluded, "[m]eanwhile, you must either prepare to serve in the National Health Service Corps or accept the financial penalty for failure to complete such preparation."

Seemingly in response, on May 26, 1980, the defendant requested a one-year deferment for "an internship which shall qualify me to serve in the full-time clinical practice of my profession as a civilian member of the Corps." [1]

This letter apparently crossed in the mail with one from the Secretary dated May 28, 1980, which modified the original prohibition against surgical residencies. Under the new policy, a general surgery residency for one year would be approved if the training included three months of primary care rotations in internal medicine or pediatrics. Students were asked to submit, on or before June 30, 1980, copies of their employment agreements and a signed statement from the director of medical education certifying that the projected training satisfied the primary care provision.

On November 14, 1980, the Secretary once again requested a statement from defendant to substantiate his program's compliance with the three-month primary care requirement. Defendant replied on December 5, 1980, that he could not possibly alter his training program at that late date to include the primary care component.

The Secretary declared defendant in default as of December 22, 1980. Defendant protested that because he had not received a denial of his May 26, 1980 request for a one-year deferment, he had assumed his course of training had been approved. Following this exchange of correspondence, the Secretary began collection efforts, culminating in this suit brought in the District Court of New Jersey in 1984. In the meantime defendant had enrolled in an orthope-

---

**1.** This language largely tracks the wording of 42   U.S.C. § 254m(a).

dic residency, which he completed in 1985. He then received a National Research Service Award and completed a year of biomedical research at the Hospital For Special Surgery, Cornell University Medical College, and Memorial Sloan Kettering Cancer Center in New York. The Secretary rejected the defendant's contention that this research should be credited toward his service obligation on the ground that "[o]ur policy is that individuals in default status are not eligible for consideration to fulfill their service obligations" through a research award.

After discovery, the district court entertained the parties' motions for summary judgment. In reviewing the record, consisting mainly of documentary evidence, the court concluded that defendant had breached his contract by reneging on his two-year service obligation. This breach and his failure to satisfy the conditions of his deferment triggered application of the treble damages provision provided in 42 C.F.R. § 62.10(c).[2]

Because the defendant had not applied for nor secured the Secretary's prior approval, the district court refused to grant the credit for service under the National Research Service Award. The judge reasoned that "to allow students [to unilaterally determine the nature of the service obligation] ... would vitiate and negate the congressional intent in establishing the program of providing medical care and service in areas currently underserved by medical personnel."

Recognizing that the congressional goal was not to obtain financial remuneration but to meet pressing health needs, the court granted a stay of thirty days so that negotiations might bring about an accommodation "whereby [defendant] will commence to provide services pursuant to the aims of the NHSC program." When the

parties were unable to reach an agreement, the court entered judgment for the Secretary.

On appeal, defendant argues that genuine issues of fact preclude summary judgment and that the Secretary's claim for treble damages lacks support in the statute. He also renews his claim that the time spent in biomedical research should be applied to his service obligation.

## I.

We had occasion to review the National Health Service Corps Scholarship Program in *Hahn v. United States*, 757 F.2d 581 (3d Cir.1985), and therefore need not discuss its general features in detail at this time. Essentially, the program was designed to improve the delivery of medical services in health manpower shortage areas. As the Senate Committee on Labor and Public Welfare emphasized, it did not view the program "as a mechanism solely intended to subsidize health professional education," but rather "as a means to overcome a geographic maldistribution of health professionals." S.Rep. No. 887, 94th Cong.2d Sess. 201 (1976).

Congress established the Scholarship Program as an inducement to students interested in pursuing a medical career in certain professional fields to serve in geographical areas where physicians were in short supply. 42 U.S.C. § 254l (f).[3] To ensure that each student understood the terms of the bargain, the statute required participants to sign a contract which included a provision for liquidated damages.

■ Defendant maintains that he was primarily interested in a career in family medicine when he applied for funding, but decided to specialize in surgery during the summer of 1979 before beginning his fourth year of study. He chose to take

---

**2.** 42 C.F.R. § 62.10(c) reads in pertinent part, "[i]f a participant fails to begin or complete the period of obligated service incurred under § 62.8, including failing to comply with the applicable terms and conditions of a deferment granted by the Secretary, the participant must pay to the United States [treble damages].... Payment of this amount shall be made within 1 year of the date that the participant failed to

begin or complete the period of obligated service."

**3.** Scholarship recipients must serve a minimum of two years in the Corps, even if they receive aid for only one term. 42 U.S.C. § 254l (f)(1)(B)(iv).

that path, although the Secretary's letter of October 30, 1979, advised that such specialization could begin only after service of the obligated time.

Despite this explicit warning, defendant negotiated a one-year surgical internship at Rutgers Hospital in March 1980. When he asked for a five-year postponement, defendant did not disclose that arrangement to the Secretary. Unsuccessful, defendant then artfully worded his request for a one-year deferment. Once again defendant neglected to inform the Secretary that this internship in surgery was the basis of a contract with Rutgers which had already been signed.

All might have been well, however, had he taken advantage of the May 1980 change in policy on surgery residencies. Defendant argues that Rutgers could not alter its schedule, and, therefore, he could not comply with this condition. The difficulty, however, was the result of his outright disregard of the Secretary's earlier disapproval of a surgery internship. Although defendant complains he never received a formal rejection of his May 1986 request, clearly nothing in his carefully vague letter revealed that he desired a deferment for anything but an approved course of training.

Our review of the record convinces us that the undisputed material facts establish that defendant breached his contract and, therefore, the district court properly entered summary judgment against him on the liability phase of the case.

## II.

Defendant contends that the statute does not authorize treble damages for failure to begin an approved internship. According to his reading, 42 U.S.C. § 254o (b)(1)[4] allows damages solely for failure to begin or complete the service obligation and does not apply to a student who defaults before his service period begins. Following that line of reasoning, defendant insists 42 C.F.R. § 62.10(c), providing penalties for not securing a proper deferment, exceeds statutory bounds because the offending conduct occurred before the service obligation actually began.

We are unable to accept the defendant's argument. The government's case rests on breach of contract; thus, the agreed terms are material. In the March 25, 1979 agreement, the defendant expressly assented to "those obligations imposed under the regulations implementing the Scholarship Program in 42 CFR Part 62."

■ Government contracts differ from agreements between private parties. Where valid regulations apply and require inclusion of a specific clause in public contracts it will be incorporated even if omitted from the writing or not approved by the parties. *See United States v. New Orleans Public Service, Inc.*, 553 F.2d 459, 469 (5th Cir.), *vacated on other grounds*, 436 U.S. 942, 98 S.Ct. 2841, 56 L.Ed.2d 783 (1978). *See also Construction, Ltd. v. Brooks-Skinner Bldg. Co.*, 488 F.2d 427, 432–33 (3d Cir.1973). *G.L. Christian & Assoc. v. United States*, 320 F.2d 345, 160 Ct.Cl. 58 (1963).[5] However, a regulation contrary to or inconsistent with the governing statute is not incorporated by operation of law. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 304–08, 99 S.Ct. 1705, 1719–20, 60 L.Ed.2d 208 (1979). In dictating the terms of the contract between the Secretary and students, Congress provided that the agreement contain recitations of the period of obligated service and damages for breach. In addition, the Secretary was given discretion to add "such other statements of the rights and liabilities of the Secretary and of the individual, not inconsistent with

---

**4.** Section 254o (b)(1) in pertinent part provides: "if an individual breaches his written contract by failing ... either to begin such individual's service obligation ... or to complete such service obligation, the United States shall be entitled to recover from the individual an amount determined in accordance with the [treble damages] formula...."

**5.** *See* Braude & Lane, Modern Insights on Validity and Force and Effect of Procurement Regulations—A New Slant on Standing and the *Christian* Doctrine, 31 Fed.B.J. 99 (1972); Note, Defense Contractor's Peril: The Written Agreement May Not Contain All the Terms, 37 S.Cal. L.Rev. 452 (1964).

the provisions of this subpart." 42 U.S.C. § 254*l* (f)(4).

In the case at hand, the writing itself referred specifically to the governing regulations. Defendant, therefore, had actual notice that they applied to and became part of his agreement with the government. The question then is whether the particular regulation that defendant challenges is contrary to the statutory provisions. We do not find it so and are persuaded that § 62.10(c) is consistent with the thrust of 42 U.S.C. § 254*o* (b)(1).

■ Inadequate preparation for assignment effectively prevents the medical school graduate from serving his obligation in the practice areas that were the object of congressional concern. The deferment regulations further the aims of the program and fall within the ambit of the statute. Because the record here sustains that interpretation, we conclude that the terms of 42 C.F.R. § 62.10 were properly incorporated into the defendant's contract. Accordingly, defendant is liable for damages under the statutory provisions. We differ with the district court, however, in the determination of the appropriate amount.

### III.

The government's position on the issue of breach is in harmony with the statute, but the Secretary has contravened a congressional mandate in refusing to give credit for the time defendant spent under the Research Award.

As we commented in *Hahn v. United States,* the statute provides that in return for scholarship aid, a recipient may select among a number of alternatives to satisfy his part of the bargain. He may serve as a commissioned officer or a civilian employee in the Public Health Service, set up private practice under certain conditions in specified areas, or conduct research under a National Research Service Award. The student—not the Secretary—chooses the option. Until 1981, the only exception to that general proposition fell under the research alternative. Under the version of the statute then in effect, if a recipient demonstrated "exceptional promise for

medical research, the Secretary may permit such individual to perform his service obligation under the National Research Service Award program." 42 U.S.C. § 294u(e) (1980) (current version at 42 U.S.C. § 254m(e) (West Supp.1987)). A student who wished to pursue that avenue of service was required to secure the Secretary's approval in advance.

However, on August 13, 1981, the statute was amended to read: "[n]otwithstanding any other provision of this subchapter, service of an individual under a National Research Service Award under subparagraph (A) or (B) of § 289*l* –1(a)(1) of this title shall be counted against the period of obligated service which the individual is required to perform under the Scholarship Program." Act of Aug. 13, 1981, Pub.L. No. 97–35, tit. 27, § 2709(c)(6), 95 Stat. 909 (codified at 42 U.S.C. § 254m(e)).

Legislative history reveals that Congress believed a reduction in the size of the National Health Service Corps was appropriate then because of an expectation that a projected national surplus of physicians would channel doctors into underserved areas. *See* H.R. Conf.Rep. No. 208, 97th Cong., 1st Sess. 783–84 (1981), *reprinted in* 1981 U.S.Code Cong. & Admin.News 1010, 1145–46. *See also* S.Rep. No. 125, 97th Cong., 1st Sess. 5 (1981) (accompanying Labor and Human Resources Committee's report of National Health Service Corps Amendments of 1981, S. 801). At the same time, however, Congress recognized a need to stimulate physicians' interest in applying for National Research Service Awards for work in biomedical fields. *See* H.R.Conf.Rep. No. 208, *supra,* at 802–03.

When it first provided the research option in 1976, Congress had expressed a hope that the Secretary "would use his authority to release such individuals who demonstrate extraordinary promise respecting biomedical research." H.R.Conf. Rep. No. 1612, 94th Cong., 2d Sess. 106, *reprinted in* 1976 U.S.Code Cong. & Admin.News 5058, 5071 (accompanying passage of Health Professions Act, Pub.L. No.

94–484). The conference report further required that the Secretary report annually the number of recipients who satisfied their obligation through the research alternative. *See id.*

By 1981, however, a stronger emphasis on research became evident. The removal of the permissive wording from the statute in that year demonstrates the congressional desire to ease the way for students who wished to enter the research track. Hence, the Secretary's discretion in deciding whether to grant credit for research service was eliminated, and the student's choice became the overriding factor.

In the case before us, the defendant's award qualified under clause (B) of 42 U.S.C. § 289*l* –1(a)(1) (1982) (amended version at 42 U.S.C.A. § 288 (West Supp. 1986)), and therefore comes squarely within the terms of the 1981 amendments.[6] That being so, the defendant must be given credit for one year of service.

Moreover, the regulations state that a participant who demonstrates "exceptional promise for medical research may perform the period of obligated service owed ... by participating in the National Research Service Award Program for Individual Postdoctoral Fellows." 42 C.F.R. § 62.8(f). Exceptional promise will be shown if a participant applies for a National Research Service Award, is selected, and accepts the offer. *See id.* The regulations further direct that a Scholarship Program participant who properly exercises the research option "will receive credit toward satisfying the period of obligated service." *Id.* Thus the defendant met the requirements under the regulations as well.

The Secretary asserts that as a "matter of policy" individuals in default status should not be permitted to fulfill their service obligation through a National Research Service Award. The default status policy, however, has not been consistently applied.

The Secretary does not prohibit all students in default from performing service in lieu of paying treble damages. Those individuals willing to engage in a full-time private clinical practice at a site designated as priority for Corps physicians may substitute their service for damages even after default. The individuals who make that choice do not benefit from the Secretary's regular practice of giving consideration, as far as feasible, to the doctor's preference for location. In short, if a physician in default accepts the service alternative, he may be assigned wherever the Secretary decides a priority exists without regard for the convenience of the doctor or hardship to his family.

In precluding site choices by delinquent physicians, the Secretary treats them less considerately than those who begin service promptly in accordance with their agreement. That less accommodating approach is understandable and, in most circumstances, not inconsistent with the statute.

■ The policy of accepting service, even though belated, in lieu of monetary payments conforms to the goals of the Scholarship Program. Congress did not establish the program to subsidize medical education generally; neither did it enact the damage provisions to produce revenues. The purpose is to supply medical services where shortages exist, and the Secretary's policy of accepting service even after default advances that statutory objective.

It may appear inequitable that an individual fortunate enough to secure a research award receives more favorable treatment than one in default who does not qualify for this alternative. Nevertheless, the clear language of the statute requires that result. Qualified research projects unequivocally earn credit for time so spent. The Secretary's action in this instance is directly contrary to the terms of the 1981 amendment; he is not free to ignore this congressional directive.

The Secretary, therefore, must give credit against the defendant's obligation of two years service for the one year spent on the Research Award project. Treble damages for only one year may be imposed in the

---

**6.** Clause (B) enables public and non-profit private institutions themselves to select individuals to receive National Research Service Awards for biomedical and behavioral research.

circumstances here. Accordingly, the case is remanded for modification of the judgment in favor of the United States by awarding credit for one year of service and to that extent reducing the amount due.

BECKER, Circuit Judge, concurring and dissenting.

I join in all of the majority's opinion except for Part II. Although Dr. Bills' situation is not terribly sympathetic, I decline to join in Part II because I do not believe that Congress intended a treble damage remedy to apply to a breach of the scholarship contract prior to appointment to the National Health Service Corps ("Corps").

## I.

### A.

Damages for breach of the scholarship contract is dealt with in 42 U.S.C. § 254o. As I read this section, the extent of damage liability as a result of breach of the scholarship contract hinges upon whether breach of the contract occurs *before* or *after appointment to the Corps.* Subsection (a) of § 254o deals with breaches which occur *prior* to appointment to the National Health Services Corps, as a result of such matters as failure to maintain academic standing, dismissal from institution, voluntary termination or failure to accept payment.[1] In contrast, subsection (b) deals with breaches that occur as a result of an individual's failure to "begin ... or to complete [his or her] *service obligation."* 42 U.S.C. § 254o (b)(1) (emphasis added). Because § 254m(c)(1) provides that the service obligation begins on the date an individual is appointed to the Corps, subsection (b) of § 254o obviously deals with breach of the scholarship agreement *after* appointment. Damages for this type of breach are trebled.[2]

In my view, the breach which occurred in this case (failure to secure an approved deferment) is more properly understood as a subsection (a) form of breach. In each of the forms of breach delineated in subsection (a), the scholarship recipient, through some purposeful action or inaction, fails to meet the requirements for service in the Corps. That is true here. Furthermore, in each situation under subsection (a) *appointment to the Corps has not occurred.* That is also true here. Dr. Bills has never been appointed to the Corps, and he continues to maintain that it has always been his intention to satisfy his obligation to the program. In accordance with the plain language of the statute, therefore, Dr. Bills has not committed a breach that permits treble damages.

As a matter also of policy, Dr. Bills' breach is not as egregious as a "treble damages breach" where the recipient has had the benefit of having his education financed, has been appointed to the Corps, and *then* fails to commence or complete service. Drawing a line at the time of appointment in my view intelligently distin-

---

**1.** Section 254o reads as follows:
(a) An individual who has entered into a written contract with the Secretary under section 2541 of this title and who—
(1) fails to maintain an acceptable level of academic standing in the educational institution in which he is enrolled (such level determined by the educational institution under regulations of the Secretary),
(2) is dismissed from such educational institution for disciplinary reasons,
(3) voluntarily terminates the training in such an educational institution for which he is provided a scholarship under such contract, before the completion of such training, or
(4) fails to accept payment, or instructs the educational institution in which he is enrolled not to accept payment, in whole or in part, of a scholarship under such contract,
in lieu of any service obligation arising under such contract, shall be liable to the United States for the amount which has been paid to him, or on his behalf, under the contract.

**2.** Section 254o provides, *inter alia,* as follows:
Except as provided in paragraph (2), if an individual breaches his written contract by failing (for any reason not specified in subsection (a) of this section or section 254q(b) of this title) either to begin such individual's service obligation in accordance with section 254m or 254n of this title or to complete such service obligation, the United States shall be entitled to recover from the individual an amount determined in accordance with the [treble damages] formula ...

guishes a breach involved in a scholarship recipient's preparation for service from the breach involved when a recipient pointedly refuses to serve.

### B.

The majority does not assert that the statute alone authorizes treble damages for Dr. Bills' breach. Instead, the majority contends that treble damages are appropriate because of the regulations at 42 C.F.R. Part 62, with which Dr. Bills' contract bound him to comply. Section 62.10(c) of Part 62 provides:

> If a participant fails to begin or complete the period of obligated service ..., *including failing to comply with the applicable terms and conditions of a deferment* ..., [then treble damages are calculated].

(emphasis added).

Despite the incorporation of this regulation into the contract, the majority agrees that the regulation does not bind Dr. Bills if it is contrary to the statutory provisions or in excess of statutory authority. Maj.Op. at 377–378. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 304–08, 99 S.Ct. 1705, 1718–20, 60 L.Ed.2d 208 (1979); *United States v. Larionoff,* 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1976). The majority claims that the regulation is consistent with the statute solely on the grounds that "[i]nadequate preparation for assignment effectively prevents the medical school graduate from serving his obligation in the practice areas that were the object of Congressional concern." This need for preparation convinces the majority that "[t]he deferment regulations further the aims of the program and fall within the

ambit of the statute." Typescript Opinion at 11.

In my view, the majority's reasoning does not properly address the question of single or treble damages. Certainly "inadequate preparation for assignment" by failure to begin an approved internship undermines the usefulness of a medical graduate. But any breach of the contract listed in § 254*o* prevents the aid recipient from fulfilling his or her service obligations to the government. The question before us is only whether Congress has authorized the punishment of this breach with treble or single damages.

The statutory language is clear that only breaches following "appointment" to the service may be punished with treble damages. Thus, in my view, the regulation authorizing treble damages for breach of the conditions of deferment is invalid and cannot be the basis for a treble damages award in this case.

### II.

I might be concerned about my reading of the statute and regulations if I believed that it rendered the Secretary remediless. As I see it, however, the Secretary has two powerful options where a scholarship recipient fails to secure an "approved" deferment.

First, he may recover "single damages" —the amount of money paid to the recipient under the program. Under the facts in this case, upon notification of Dr. Bills' non-confirming deferment in September of 1980, the Secretary could have declared Dr. Bills in default and demanded payment of all monies paid to him—$24,528.[3] This remains a viable option.

---

**3.** The Secretary might argue that "single" damages are not enough of a deterrence to a scholarship recipient's securing an unapproved deferment. It is true that a recipient could perhaps manipulate the program. For example, a medical student could misrepresent his intention of becoming a "primary care giver" in his application. After receipt of the scholarship funds and graduation from school, he could intentionally secure a "nonconforming" deferment, force an action by the Secretary for return of the scholarship funds advanced and thereby have his medical education financed by the government.

However, repayment of the full amount, usually some $25,000, may be sought by the Secretary. In my view that is quite a bit of money for a resident to pay given the notoriously low salaries of first year residents. Furthermore, the debt cannot be discharged in bankruptcy until five years after the date repayment is required. 42 U.S.C. § 254*o* (c)(3). In my view the potential financial liability is sufficient incentive for a student to incorporate the primary care rotation into his/her residency.

Second, I believe that the Secretary, instead of suing for damages, may opt to waive the "approved" deferment requirement and appoint the defaulting scholarship recipient to the Corps to begin obligated service. In Dr. Bills' case this option would lead to the following result. By statute the Secretary was *required* to appoint Dr. Bills to the Corps upon completion of his medical school training *unless* he requested a deferment of three years or less.[4] As. Dr. Bills requested n one-year deferment, the Secretary was required to defer his appointment to the Corps until completion of the one year of training (whether or not this training included the primary care rotation). At the end of that deferment, in June of 1981, the Secretary could have appointed Dr. Bills to the Corps to begin his service obligation. I see nothing to preclude the Secretary from appointing Dr. Bills to the Corps at this time and assigning him to a manpower shortage area in accordance with 42 U.S.C. § 254m(d)[5] If following his appointment to the Corps and upon assignment to a manpower shortage area, Dr. Bills "fails to begin or complete" the obligated service, he is then in breach of his contract and treble damages are determined in accordance with 42 U.S.C. § 254o (b)(1).

For the foregoing reasons I respectfully dissent from Part II of the majority's opinion and the affirmance of the award of treble damages.

---

**4.** *See* 42 U.S.C. § 254m(b)(5)(A) and (c).

**5.** Of course, the amount of service which Dr. Bills owes to the program is only one year since the Secretary is statutorily required to accept

Dr. Bills' service under the National Research Service Award Program. *See* Majority Opinion, Part III.