The SOUTHLAND
CORPORATION, Plaintiff,

v.

ASHLAND OIL, INC., et al.,
Defendants.

Civ. No. 88–0700.

United States District Court,
D. New Jersey.

Oct. 6, 1988.

Archer & Greiner by Christopher R. Gibson, Haddonfield, N.J., for plaintiff.

Picco Mack Kennedy Jaffe Perrella & Yoskin by Kenneth H. Mack, Trenton, N.J., for defendants.

## OPINION

CLARKSON S. FISHER, District Judge.

Before the court are cross-motions for partial summary judgment by plaintiff The Southland Corporation ["Southland"] and defendants Ashland Oil, Inc. and Ashland Chemical Co. ["Ashland"]. Southland seeks partial summary judgment and a declaration of liability against Ashland on the First, Second and Fourteenth Counts of its Complaint. Ashland opposes Southland's motion and, in addition, seeks partial summary judgment dismissing Counts One, Two, Four and Fourteen of Southland's Complaint.

The subject of these motions addresses that part of Southland's suit against Ashland which requests a declaratory judgment with regard to Ashland's liability for past and future response costs incurred by Southland, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ["CERCLA"], 42 U.S.C. §§ 9601 *et seq.*, as well as its breach of contract claim. In short, Southland seeks a declaration, under CERCLA, that Ashland is strictly liable to Southland in contribution or indemnity for that part of

the cleanup costs incurred by Southland to correct over three decades of dumping hazardous and toxic waste at the Great Meadows chemical manufacturing plant which is attributable to that period of time which Ashland owned and operated the plant.[1] Ashland seeks a determination that the Agreement of Sale and Purchase (the "Agreement") entered into between the parties bars any recovery by Southland under CERCLA as well as any claim for indemnification under the contract.

The following facts are undisputed. In 1966, Ashland purchased the Great Meadows chemical plant and its surrounding real property when it acquired all of the stock of Fisher/Gamma. Fisher/Gamma had owned and operated the plant as a chemical manufacturing unit since 1950. Subsequent to its acquisition in December 1966 and until the sale to Southland in May 1978, Ashland operated the Independence Township facility as a "fine" chemical manufacturing plant, specializing in synthetic organic chemicals and hair dye intermediates which it produced in small quantities on a custom-made basis.

During the time Ashland owned and operated the chemical plant, hazardous waste from its manufacturing processes, in the form of toxic chemicals, were routinely disposed of at various disposal sites on plant property. Ashland does not dispute this and, in fact, informed the United States Environmental Protection Agency ["EPA"] of its status as a "past owner" of a hazardous waste site in a report filed, pursuant to section 103(c) of CERCLA, 42 U.S.C. § 9603(c), on June 8, 1981.[2] The sites designated for waste disposal included a limefield; a solid waste dump, known as the landfill; a chemical dump; Fisher Pond and other unlined ponds; and spray fields. Numbered among the hazardous wastes discharged or buried at the various sites

were the following chemicals: benzene, toluene, xylene, chlorobenzene, trichlorethane, methylene chloride, and chlorinated benzene compounds.

Problems at the facility were recognized as early as 1968 when Ashland, under a court order to halt the release of heavy metals into the Pequest River, constructed a waste water treatment plant. On April 23, 1975, Ashland entered into a Consent Judgment with the New Jersey Department of Environmental Protection ["NJDEP"] which targeted the correction of air pollution and odor problems, the removal of waste drums, improvements in maintenance procedures, and required the hiring of a full-time process/environment engineer. Ashland ceased using the limefield, landfill, chemical dump and the spray fields for waste disposal.

As a result of these efforts, some improvement was made; however, the NJDEP was still voicing concern over the environmental conditions at the plant in 1977—in particular, the problem of groundwater contamination. By mid–1977, Ashland began a search for a buyer for the plant. After two unsuccessful attempts with different prospective purchasers, negotiations with Southland culminated in the sale of the Great Meadows plant in May 1978.

At the direction of the NJDEP, Southland began an in-depth study of the environmental conditions at the plant in the early 1980s. A request made to Ashland for assistance was denied. These studies revealed severe groundwater contamination and in February 1986, Southland entered into an Administrative Consent Order with the NJDEP, requiring Southland to conduct a Remedial Investigation and Feasibility Study ["RI/FS"] at the plant. Once again, Ashland rejected a demand by

1. Southland also alleges, in Counts One and Two of its Complaint, that Ashland is liable not only for the environmental conditions caused by its own waste disposal but is additionally responsible as successor-in-interest for the waste disposal practices of its predecessor, Gamma Chemical Corporation, a subsidiary or affiliate of Fisher Chemical Co., Inc. (collectively referred to as "Fisher/Gamma"). Because South-

land doesn't raise this issue in its moving papers and fails to offer any legal argument for its contention, I will not address it here.

2. In its report to the EPA, Ashland estimated that 150,000 cubic feet of hazardous waste had been disposed of over an area of ten acres of land.

Southland to participate in the cleanup. Southland subsequently entered into a second Administrative Consent Order with the NJDEP, in August 1987, which requires Southland to implement a NJDEP-approved cleanup of the contaminated facility pursuant to the Environmental Cleanup Responsibility Act ["ECRA"], N.J.Stat.Ann. §§ 13:1K–6 to 13:1K–14 (West Supp.1988).

By August 1987, the studies conducted by the RI/FS consultants, Geraghty & Miller, were complete. Their report showed high levels of volatile organic compounds [3] ["VOC"], base-neutral extractable and acid extractable organic compounds, PCBs and heavy metals in the groundwater, surface water, and soil around the facility. A study of the groundwater and surface waters also showed a concentration of totally dissolved solids ["TDS"], consisting of ammonia, calcium, sodium, sulfates, fluoride, magnesium, potassium and nitrates. The highest concentration of these compounds were found around the sites utilized for waste disposal.

Ordered by the NJDEP to remedy the pollution problem at the plant, Southland instituted this action to compel Ashland to contribute to the costs already incurred in assessing the environmental conditions as well as that amount necessary to rid the facility of the contamination.[4] Southland's Complaint also alleges fraud, breach of contract, nuisance and various state and federal statutory claims; however, in this motion, it requests summary judgment on its CERCLA claims only and seeks a declaration that Ashland is liable under sections 107(a) and 113(f) for cleanup costs at the plant.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Brown v. Hilton*, 492 F.Supp. 771, 774

(D.N.J.1980). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Goodman v. Meade Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). This "burden ... may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Nonetheless, in deciding a motion for summary judgment, the facts and inferences therefrom are construed in a light most favorable to the nonmoving party. *Pollock v. American Telephone & Telegraph Long Lines*, 794 F.2d 860, 864 (3d Cir.1986).

CERCLA was first enacted in 1980 to provide a solution to the growing number of "uncontrolled 'inactive hazardous waste sites'" and to remedy the severe environmental problems caused by extensive negligent hazardous waste disposal practices. *United States v. Price*, 577 F.Supp. 1103, 1109 (D.N.J.1983). Through the original enactment and its subsequent amendment in 1986, Congress has provided a number of mechanisms for recovery of costs for hazardous waste cleanups. In asserting its CERCLA claims against Ashland, Southland relies on two sections which are of particular relevance to private party actions—sections 107(a) and 113(f). Both sections reflect a Congressional intent to allocate the financial burden of cleaning up hazardous waste sites between those parties responsible for causing the contamination. *Chemical Waste Management, Inc. v. Armstrong World Indus., Inc.*, 669 F.Supp. 1285, 1290 n. 6 (E.D.Pa.1987).

■ Section 107(a) of CERCLA authorizes a private party to bring suit against any person who owned or operated a facility at a time when hazardous waste was

---

**3.** Among the VOCs detected in the sediment at the site were toluene, chlorobenzene, xylene, chloroform, ethyl benzene, acetone, methylene chloride, chloromethane, 2–butanone and 1, 1–1 trichloroethane. In addition, soil samples revealed increased concentrations of heavy metals, including zinc, selenium, copper arsenic, antimony as well as PCBs.

**4.** Southland estimates that it has already expended close to $1 million to investigate the extent of environmental damage at the plant and expects the cleanup costs to exceed $10 million.

disposed of to recover those costs expended in response to the environmental crisis.[5] *Cadillac Fairview/California v. Dow Chemical Co.*, 840 F.2d 691, 693 (9th Cir. 1988); *T & E Indus., Inc. v. Safety Light Corp.*, 680 F.Supp. 696, 705 (D.N.J.1988). To be granted a declaratory judgment on the issue of liability, Southland, as plaintiff, must establish four factors to satisfy the requirements of section 107(a): (1) that the Great Meadows chemical plant is a "facility"; (2) that Ashland is a "covered party" as defined by the Act; (3) that a "release" or "threatened release" of a hazardous substance from the plant has occurred; and (4) that, as a result, Southland has incurred response costs. *T & E Indus., Inc. v. Safety Light Corp.*, 680 F.Supp. at 708.

Southland also asserts a claim for contribution under section 113(f) of CERCLA, as amended under the Superfund Amendments and Reauthorization Act of 1986 ["SARA"], Pub.L. No. 99-499, 100 Stat. 1647 (1986). This section provides an express right to seek contribution from "any other person who is liable or potentially liable under section 107(a)." Prior to the SARA amendments, a number of courts held that while CERCLA did not expressly provide for a private right of contribution, the inclusion of section 107(e)(2)[6] in the statute preserved claims for contribution under the federal common law. *See United States v. New Castle County*, 642 F.Supp. 1258, 1265 (D.Del.1986); *Colorado v. Asarco, Inc.*, 608 F.Supp. 1484, 1491-92 (D.Colo.1985). Now, under section 113(f), a district court is expressly permitted to "al-locate response costs among liable parties using such equitable factors as the court determines are appropriate." 42 U.S.C. § 9313(f)(1) (1988).

Clearly, the Great Meadows plant falls within the broad definition given to "facility" by section 101(9) of the statute.[7] *See New York v. General Electric Co.*, 592 F.Supp. 291, 295 (N.D.N.Y.1984). It is undisputed that from 1966 until the sale to Southland in May 1978, Ashland owned and operated the plant. If hazardous materials were disposed of during that time period, it follows that Ashland falls neatly within that class of persons section 107(a)(2) was meant to reach—prior owners and operators. *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1044 (2d Cir.1985).

■ Ashland makes no attempt to dispute the fact (as evidenced by the voluminous documentation submitted by Southland) that during the time it owned the chemical plant, vast amounts of hazardous wastes were pumped directly onto and beneath the property surrounding the plant and that these releases continue to contaminate the property today. Ashland does argue, however, that Southland has failed to show that the "response costs" incurred were both "necessary" and "consistent with the national contingency plan" as required by section 107(a).

When considered in light of the relief that Southland seeks at this stage of the action, Ashland's argument must fail. By definition, response costs include remedial action taken to "... monitor, assess and

---

**5.** Section 107(a) provides, in pertinent part:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section—
    (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, ... shall be liable for—
    (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan.
42 U.S.C. § 9607(a)(2)(B) (1982).

**6.** Section 107(e)(2) provides:

Nothing in this subchapter, including the provisions of paragraph (1) of this subsection, shall bar a cause of action that an owner or operator or any other person subject to liability under this section, or a guarantor, has or would have, by reason of subrogation against any person.
42 U.S.C. § 9607(e)(2) (1982).

**7.** Under section 101(9), "facility" is defined as:

    (A) any building, structure, installation, equipment, pipe or pipeline ..., well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located ...
42 U.S.C. § 9601(9) (1982).

evaluate ..." environmental conditions. 42 U.S.C. § 9601(23)(25) (1982). Remedial investigations such as the one undertaken by Southland are consistently held to be within the scope of response costs. *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892 (9th Cir.1986). Moreover, while the need for a factual determination on specific costs would preclude summary judgment on the issue of damages at this stage, this is not the result when the request is for a declaration of liability. *T & E Indus., Inc. v. Safety Light Corp.*, 680 F.Supp. at 709. A finding that the type of recovery Southland seeks is included within the meaning of response costs is sufficient at this stage. *Id.* Thus, Southland has met its burden.

Liability under CERCLA is strict—no showing of negligence is required. *New York v. Shore Realty Corp.*, 759 F.2d at 1044. Nonetheless, CERCLA's liability provisions are subject to three express defenses set forth in the statute: an act of God, an act of war and the "innocent landowner" defense. 42 U.S.C. § 9607(b) (1982). Ashland does not and cannot, however, seek shelter under the umbrella of any of these defenses. Instead, it contends that the Agreement entered into between the parties at the time of sale acts as a complete bar to Southland's CERCLA claims as well as Southland's indemnification claim in Count Four.

Determination of this issue requires a two-part inquiry. First, do CERCLA's liability provisions preclude a contractual allocation of liability between private parties? Second, if not, are the terms of this particular pre-CERCLA Agreement sufficient to effect an assumption of liability by Southland as to any claims arising out of Ashland's waste disposal practices?

By its own terms, CERCLA expressly preserves the right of private parties to contractually transfer to or release another from the financial responsibility arising out of CERCLA liability. Section 107(e)(1) provides:

> No indemnification, hold harmless, or similar agreement or conveyance shall be effective to transfer from the owner or operator of any vessel or facility or from any person who may be liable for a release or threat of release under this section. Nothing in this subsection shall bar any agreement to insure, hold harmless, or indemnify a party to such agreement for any liability under this section.

42 U.S.C. § 9607(e)(1) (1982). Under this provision, parties remain accountable for any costs incurred in a government-instituted cleanup, regardless of conveyance or transfer; however, between private parties, they retain the freedom to contract out of CERCLA liability. *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1459 (9th Cir.1986).

Southland's efforts to convince this court that the Third Circuit's holding in *Smith Land & Improvement Corp. v. Celotex Corp.*, 851 F.2d 86 (3d Cir.1988) controls this issue meet with no success. In *Smith Land*, the Third Circuit held only that the doctrine of caveat emptor is not a defense to CERCLA claims and thus cannot be used as a vehicle for transfer of CERCLA liability to a purchaser. 851 F.2d at 90. This is vastly different from a holding which would disallow an express contractual assumption of liability to be raised as a defense. In fact, the contract defense was never before the *Smith Land* court and the issue was never addressed. As such, Southland's reliance on it for this proposition is misplaced and its argument without merit.

CERCLA, therefore, does not abrogate the parties' contractual rights. *Chemical Waste Management v. Armstrong World Indus., Inc.*, 669 F.Supp. at 1293. Parties who fall within the scope of the Act are free to enter into agreements whereby they are indemnified or held harmless by another party. *FMC Corp. v. Northern Pump Co.*, 668 F.Supp. 1285, 1289–90 (D.Minn. 1987) ("... 42 U.S.C. § 9607(e)(1) clearly provides that CERCLA liability is not sufficient for the recovery of costs between private parties where one such party has released the other from its CERCLA liability").

The second level of inquiry—whether the Agreement effected a transfer of Ash-

land's CERCLA liability—is simply one of contract interpretation. Paragraph 14.01 of the Agreement provides that it "... shall be governed by, and construed and enforced under, the laws of the State of New Jersey." In New Jersey, contract interpretation is a question of law for the court. *First Jersey National Bank v. Dome Petroleum Ltd.*, 723 F.2d 335, 339 (3d Cir.1983). The search is restricted to discovering the objective intent of the parties as manifested in the language of the contract. *Dome Petroleum Ltd. v. Employers Mut. Liability Ins. Co.*, 767 F.2d 43, 47 (3d Cir.1985); *Communication Workers of America, Local 1087 v. Monmouth County Bd. of Social Services*, 96 N.J. 442, 452, 476 A.2d 777 (1984). If the contractual language is clear and unambiguous, summary judgment may be entered "despite the parties' differing views as to what consequences flow from those clauses." *United States v. Bills*, 639 F.Supp. 825, 829 (D.N.J.1986), *modified on other grounds*, 822 F.2d 373 (3d Cir.1987).

Ashland argues that the language of the contract evidences the parties' intent to transfer all waste disposal liabilities to Southland, if not at the time of sale, then at least within two years thereafter. In support of this contention, Ashland points to four specific clauses: the "as is, where is" provision (section 6.06); the indemnification provision (section 9.01); the waste removal provision (section 11.15); and the two-year survival provision (section 11.03). Southland maintains, however, that these same provisions show that there was never any intention to transfer CERCLA–like claims to it and that the absence of explicit language whereby Southland assumed this liability is further indication of this.

■ Section 6.06 of the Agreement between Ashland and Southland provides:

THE ASSETS ARE SOLD ON AN "AS IS, WHERE IS" BASIS WITHOUT WARRANTY OR GUARANTEE AS TO QUALITY, CHARACTER, PERFORM-

ANCE, OR CONDITION, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OR GUARANTEE OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

Ashland argues that because the term "as is" negates any representation on the part of the seller with regard to warranty or guarantee, this somehow conveys the idea that the purchaser assumes *all* the associated risks. This argument is unpersuasive. As Southland correctly notes, an "as is" provision is merely a warranty disclaimer and as such precludes only claims based on breach of warranty. *Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F.Supp. 1049, 1055 (D.Ariz.1984), *aff'd*, 804 F.2d 1454 (9th Cir. 1986). It does not act to shift liability from one party to an agreement to another and is inapplicable in a cause of action which is not based on breach of warranty. *Mardan, supra.* Therefore, standing alone, the "as is" clause cannot defeat Southland's CERCLA claims.

■ Next, Ashland relies on section 11.15, a waste removal provision, as support for its contention that Southland waived its right to bring a CERCLA claim. It provides:

On or before the Settlement Date, Buyer shall notify Seller of any waste material which, by bid from an independent third party, shall cost $5000 or more to remove from the Premises, and Seller, within a reasonable time thereafter, shall remove same from the Premises at Seller's expense.

Based on the pure language of this provision, I find Ashland's argument untenable. This is merely a promise to do an act—to remove waste material upon proper notice. Assuming, *arguendo*, that the two-year limitation in section 11.03 [8] neutralizes the effect of this promise, this would only suffice to defeat a breach of contract claim. This is far from being the express assumption of liability which Ashland argues it is.

---

8. Section 11.03 provides:
   All of the representations, warranties, promises and agreements of the parties set forth in this Agreement shall survive the Clos-

ing for a period of two (2) years ... regardless of what investigations the parties may have made before the Closing.

Finally, Ashland asserts that the inclusion of an indemnification provision in section 9.01 and its subsequent termination two years later, pursuant to section 11.03, is further support for its argument that the parties, by contract, provided for a release of all claims against Ashland arising out of its prior hazardous waste disposal. In pertinent part, section 9.01 provides:

Seller shall protect, defend ... indemnify and save and hold harmless Buyer ... from and against any and all ... costs, expenses, damages, losses, obligations, lawsuits, claims, liabilities, fines, or penalties ... resulting from Seller's acts, alleged acts, omissions, and alleged omissions before the Closing Date ... arising out of, resulting from, relating to, or incident to:

(4) the ownership, use, maintenance, or operation of the Assets or the Great Meadows Business, and any action taken or omitted to be taken in connection with or relating thereto, which occurred or arose during, or relates to, any period prior to the Closing.

This argument suffers from the same defect that Ashland's section 11.5 argument did. Ashland confuses the issues of Southland's breach of contract claims and its claim based on the statute. Even if section 11.03 acts to terminate all of Ashland's promises within two years after Closing, this would only serve to bar those *breach of contract* claims based on indemnity and failure to remove hazardous waste. Excision of either section 9.01 or 11.15 from the contract does not convert the remaining contractual language into an express assumption of liability for all hazardous waste cleanup costs by Southland.

Counts One, Two and Fourteen of Southland's Complaint are based on a statutory cause of action created by sections 107(a) and 113(f) of CERCLA. While a contract can, under appropriate circumstances, act to preclude recovery of response costs, there must be an express provision which allocates these risks to one of the parties. *Chemical Waste Management v. Armstrong World Indus.*, 669 F.Supp. at 1294. Of course, Ashland can-

not be expected to have presciently referred to CERCLA in an Agreement which was executed two years prior to the statute's enactment; however, some clear transfer or release of future "CERCLA-like" liabilities is required. *See FMC Corp. v. Northern Pump Co.*, 668 F.Supp. at 1292 (a release from "all claims, demands and causes of action" was held to encompass CERCLA claims without explicit reference to the statute).

The Agreement between Southland and Ashland is completely lacking in any language which expressly releases Ashland from future liabilities based on its hazardous waste disposal practices or imposes this liability on Southland. To imply such an agreement would require the court to engage in "judicial legislation that would reshape CERCLA's liability scheme." *Chemical Waste Management, supra.* This the court will not do. As written, the Agreement cannot defeat Southland's recovery.

In addition to its contract defense, Ashland raises several other issues which it claims should bar recovery or, at least, preclude summary judgment at this stage of the lawsuit. Ashland argues that because Southland is a potentially responsible party ["PRP"] itself, any recovery under section 107(a) is barred and Southland is limited to seeking relief under section 113(f) of CERCLA. Next, Ashland contends that various equitable defenses, such as equitable estoppel, waiver, laches, unjust enrichment, assumption of the risk and unclean hands, are available and preclude Southland's recovery. At the very least, Ashland argues, these equitable defenses raise genuine issues of material fact and require additional time for discovery, thus making summary judgment inappropriate at this time. Finally, Ashland maintains that a declaration of its CERCLA liability is premature because cleanup has not begun and the parties' equitable shares have not yet been determined. I will address each of these arguments in order.

First, Ashland's assertion that Southland's status as a PRP bars it from recovery under section 107(a) is clearly er-

roneous in light of CERCLA's statutory language to the contrary. Section 107(a) authorizes "any party" to recover response costs. 42 U.S.C. § 9607(a)(1982). Furthermore, it has been conclusively established by the courts that section 107(a) can afford a responsible party the contribution relief it seeks from another responsible party. *Sand Springs Home v. Interplastic Corp.*, 670 F.Supp. 913, 916 (N.D.Okla.1987); *United States v. New Castle County*, 642 F.Supp. at 1265–69. The 1986 SARA amendments, which now expressly provide for contribution under 113(f) for "any person" from "any other person who is liable," buttress this conclusion rather than alter it. *Chemical Waste Management*, 669 F.Supp. at 1291.

■■■ Second, Ashland claims that the availability of equitable defenses, at the very least, raises genuine issues of material fact and that further discovery is required to enable Ashland to present its defenses. Once again, Ashland mistakes Southland's request for relief for something it is not. While equitable considerations are applicable in allocating the amount of contribution between parties under CERCLA, these defenses go to the issue of damages. *Smith Land & Improvement Corp.*, 851 F.2d at 90; *Chemical Waste Management v. Armstrong World Indus., Inc.*, 669 F.Supp. at 1292 ("Defendants' arguments concerning 'innocence' and 'fault' are relevant only to the amount of response costs that may [be] recover[ed]"). At present, the only relief which Southland seeks is a declaratory judgment on the issue of Ashland's CERCLA liability. The plant's alleged discounted price, the damage caused by Southland's own waste disposal practices and any other equitable considerations can all be raised at trial to mitigate damages. *See Smith Land, supra.*

■■■ Third, contrary to Ashland's contention, Southland's request for declaratory relief is not premature. Ashland argues that Southland's motion for summary judgment is not ripe at this time because actual cleanup has not yet begun and cites *United States v. Price*, 577 F.Supp. 1103 (D.N.J.

1983) and *D'Imperio v. United States*, 575 F.Supp. 248 (D.N.J.1983), as authority in support of that contention. Both cases are factually distinguishable. In *Price*, the government merely alluded to response costs and, in fact, its feasibility study was far from completion at the time its Complaint was filed. Similarly, plaintiffs in *D'Imperio* hadn't incurred any costs whatsoever, relying instead on the possibility that they may be held liable once the government completed its own feasibility study; a contingency at best. Furthermore, just recently in *Artesian Water Co. v. New Castle County*, the Third Circuit expressly approved the Delaware district court's determination (on plaintiff's motion for summary judgment on the issue of liability) that costs incurred as a result of preliminary monitoring and evaluating were sufficient, without more, for recovery under CERCLA, thus obviating the requirement that further cleanup costs be incurred. 851 F.2d 643, 651 (3d Cir.1988).

Where the facts establishing the right to declaratory relief have already occurred, the case is ripe for adjudication. *Wickland Oil Terminals v. Asarco*, 792 F.2d at 887. All of the facts necessary to support a finding of Ashland's liability under CERCLA have been established and are undisputed. Moreover, declaratory judgments as to liability for future recovery costs have been held consistent with CERCLA's purpose of encouraging prompt remedial action. *O'Neil v. Picillo*, 682 F.Supp. 706, 730 (D.R.I.1988). Hence, summary judgment on the issue of Ashland's CERCLA liability, in favor of Southland, is appropriate at this time.

■■■ One final issue must be addressed. In its cross-motion, Ashland seeks summary judgment dismissing Count Four of Southland's Complaint. In Count Four, Southland alleges that Ashland had an independent contractual obligation (aside from any obligations which arise under CERCLA) to indemnify Southland "from and against any and all . . . costs, expenses, damages, losses, obligations, lawsuits, claims, liabilities . . . resulting from [Ashland's] ownership, use . . . or maintenance

... of the Business ... prior to the Closing." Ashland, however, asserts that any obligation it assumed under this section terminated in 1980 pursuant to section 11.03, the two-year survival clause.

Contrary to Southland's assertion, whether section 11.03 applies to plaintiff's present claims under section 9.01 is at the very heart of the contractual indemnification issue. Again, this determination is an issue of contract interpretation, a question of law for the court. *First Jersey National Bank v. Dome Petroleum Ltd.*, 723 F.2d at 339. The language of section 11.03 plainly places a two-year limitation on "all of the representations, warranties, promises and agreements" made by the parties. Thus, any affirmative promise to indemnify by Ashland terminated two years after the Closing.

██ Southland, however, maintains that it filed a timely notice of claim with Ashland by letter on April 25, 1980. Whether this letter constituted proper notice of a claim encompassed by section 9.01 is an issue which need not be reached by the court. Any cause of action based on breach of the contract's indemnity provision accrued at the time Ashland failed to respond to Southland's claim—in 1980. As such, it is now time-barred under New Jersey's six-year statute of limitation for claims based on contract. N.J.Stat.Ann. § 2A:14-1 (West 1987). Any claim based on the contract which arose after 1980 is barred by the terms of the contract. Therefore, summary judgment on the issue of a contractual obligation to indemnify is granted in Ashland's favor.

For the reasons set forth above, Southland's motion for partial summary judgment on Counts One, Two and Fourteen is granted. Ashland's cross-motion for partial summary judgment is denied as to Counts One, Two and Fourteen but granted as to Count Four. An order accompanies this opinion. No costs. October 6, 1988.