**UNION CARBIDE CORP., Plaintiff,**

v.

**THIOKOL CORP., et al., Defendants and Third–Party Plaintiffs,**

v.

**RHONE–POULENC, INC., Third– Party Defendant.**

Civ. A. No. CV293–66.

United States District Court, S.D. Georgia, Brunswick Division.

Oct. 17, 1994.

Ann. § 95.11(2)(c) (West 1995); *Conner v. Cog-* *gins,* 349 So.2d 780 (Fla.Dist.Ct.App. 1 1977).

Arnold C. Young, Savannah, GA, Charles Adams Perry, Atlanta, GA, for plaintiff.

Wallace Eugene Harrell, Brunswick, GA, Jeffrey C. Wyant and Robert C. Mitchell, Chicago, IL, Robert A. Bilott, Cincinnati, OH, for defendants.

## ORDER

ALAIMO, District Judge.

On May 24, 1993, Plaintiff, Union Carbide Corp. ("Union Carbide"), filed this federal question action against Defendants/Third Party Plaintiffs, Thiokol Corp., Morton International, Inc., and Morton Thiokol, Inc. (collectively, "Thiokol"), alleging that Thiokol is liable under 1) the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et. seq. ("CERCLA"), 2) a contract indemnification clause, and 3) common law principles of contribution and indemnity for the costs of cleaning up toxic waste at a site near Woodbine, Georgia, currently owned by Union Carbide. This case is now before the Court on two motions for summary judgment: a motion filed by Defendant, Thiokol, requesting summary judgment on all counts of Union Carbide's amended complaint and on Counts I, II and III of Thiokol's counterclaim; and a motion filed by Plaintiff, Union Carbide, for partial summary judgment on the issue of Thiokol's liability under section 107 of CERCLA. For the reasons discussed below, summary judgment for Defendant will be **GRANTED** in part and **DENIED** in part, and partial summary judgment for Plaintiff will be **GRANTED** in part and **DENIED** in part.

## FACTS

This case concerns the toxic waste contamination of a 7,200 acre parcel of real property (the "site") located near Woodbine, Georgia. Thiokol owned the site from 1963 until November, 1976. From 1967 until November of 1976, Thiokol processed for Union Carbide the pesticide, Temik, an aldicarb product, at the site. This was done pursuant to contracts which included a "Toll–Processing" agreement dated October 14, 1971. Under Article 24 of the Toll–Processing agreement, Thiokol agreed to indemnify Union Carbide for all of Thiokol's activities in manufacturing Temik. During that period, Thiokol also manufactured other products, such as pyrotechnic ordnance and riot control agents.[1]

---

1. The Woodbine site's previous appearance in federal court arose from Thiokol's manufacture of pyrotechnic trip flares for the Army. On February 3, 1971, an explosion in the building where

Thiokol maintained a landfill on the site, as well as other solid waste management units ("SWMUs"), where hazardous substances were disposed.

In November, 1976, Thiokol sold the site to Union Carbide. Section 10 of the parties' asset purchase agreement provides: "Seller will indemnify and hold Buyer harmless against and in respect of: (a) any and all losses, damages, claims, or expenses based upon the conduct of Seller of its business at the Facility at any time." Section 14, however, provides that

> [A]ll statements contained in any certificate or other instrument delivered by or on behalf of Seller or Buyer, respectively, pursuant to this Agreement shall be deemed representations and warranties hereunder by Seller or Buyer, as the case may be. All representations, warranties and agreements made by Seller or Buyer, respectively, in this Agreement or pursuant hereto shall, for a period of eighteen (18) months, survive the closing hereunder and any investigation made by or on behalf of Seller or Buyer, as the case may be.

Union Carbide also used the site to manufacture agricultural chemicals, including Temik. In December, 1986, Union Carbide sold part of the site, including the manufacturing plant, to Rhone–Poulenc, Inc. Union Carbide retained 3000 acres containing the 20 acre landfill used by both Thiokol and Union Carbide and the seven SWMUs used only by Thiokol.

The primary hazardous substance at the landfill was Temik aldicarb fines, a listed hazardous waste. (Union Carbide Corporation Application for Closure/Post–Closure of Landfill, p. 3; Hazardous Waste Facility Permit No. HW–063(D), Sept. 29, 1988, p. 8). The SWMUs contain acetone, aldicarb, malononitrile, orthochlorobenzaldehyde and orthochlorobenzalmalononitrile, and possibly unexploded ordnance. (RCRA [Resource Conservation and Recovery Act] facility investigation, Law Environmental, March, 1992, p. 15)

In 1981, in accordance with a directive from the Georgia Department of Natural Resources, Environmental Protection Division ("EPD"), Union Carbide stopped using the portion of the landfill where hazardous wastes were being disposed. In 1985, some wastes were removed from the site and contaminated soil was tested and removed. On December 31, 1986, the EPD approved Union Carbide's Closure Plan for the landfill. A fence was constructed around the landfill in February of 1987, and gopher tortoises and indigo snakes were removed from the landfill. In June of 1987, a clay cap was installed over the landfill. Closure of the landfill was completed on May 14, 1988.

A Hazardous Waste Facility Permit for the landfill was issued by the EPD on September 29, 1988. In an amendment to the Georgia Hazardous Waste Facility Permit for the landfill, effective October 30, 1992, the EPD ordered a RCRA (Resource Conservation and Recovery Act) Facility Assessment (RFA) for six of the SWMUs specifically and also for any other SWMU not listed. A RCRA Facility Investigation (RFI) was then completed for all seven SWMUs, with a corrective action plan to follow. Remedial action at the SWMUs is anticipated by Union Carbide.

## DISCUSSION

### I. SUMMARY JUDGMENT

Summary judgment requires the movant to establish the absence of genuine issues of material fact, such that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). Summary judgment is also proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The non-moving party to a summary judgment motion

---

the flares were made killed 29 people and injured more than 50 others. At least 25 Federal Tort Claims Act suits were filed against the United States. *Massey v. United States,* 733 F.2d 760 (11th Cir.1984); *Aretz v. United States,* 503 F.Supp. 260 (S.D.Ga.1977) (giving background of Thiokol's manufacture of rockets for aerospace program and ordnance for Army).

need make this showing only after the moving party has satisfied its burden. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The court should consider the pleadings, depositions and affidavits in the case before reaching its decision, Fed. R.Civ.P. 56(c), and all reasonable inferences will be made in favor of the non-movant. *Griesel v. Hamlin*, 963 F.2d 338, 341 (11th Cir.1992).

Cross-motions for summary judgment do not preclude the Court from finding material facts in dispute. Each motion must be considered separately, and the Court may render judgment for one party only if it finds that there is no genuine issue of material fact and that such party is entitled to prevail as a matter of law. Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d* § 2720. *Wright v. Credit Bureau of Ga., Inc.*, 548 F.Supp. 591, 594 (N.D.Ga.1982).

### A. *CERCLA Claims*

The Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") imposes strict liability for the cost of responding to a release or threatened release of a hazardous substance on four categories of people: current owners or operators of a facility where a hazardous substance has been disposed; those who were owners or operators of a facility at the time of disposal; transporters of a hazardous substance; and those who arranged for disposal or treatment at any facility containing a hazardous substance. 42 U.S.C. § 9607(a). Private plaintiffs as well as the government may recover their response costs from parties in these four categories. 42 U.S.C. § 9613.

### 1. Statute of Limitations Under CERCLA

CERCLA has two different statutes of limitations. There is a six-year statute of limitations for an action to recover the cost of a remedial action under § 107 of CERCLA. 42 U.S.C. § 9613(g)(2)(B). The statute of limitations begins to run when there is "initiation of physical on-site construction of the remedial action." *Id.* There is a three-year statute of limitations for removal actions, which runs from the date of completion of the removal. *Id.* at (g)(2)(A).

■ Thus, in order to determine the proper statute of limitations for a CERCLA cleanup, the cleanup first must be defined as either a removal or remedial action. CERCLA distinguishes between removal and remedial actions.[2] A removal is a short-term, temporary response to a release or threatened release, while a remedial action is a long-term, more thoroughly researched and planned permanent remedy to a release or threatened release. Remedial actions are described as "those actions consistent with permanent remedy taken instead of or in addition to removal actions." 42 U.S.C. § 9601(24).

#### a. *The Landfill*

Union Carbide's CERCLA claims for the landfill are subject to the six-year statute of limitations for remedial actions. Thus, the claims are timely only if the statute of limitations did not begin to run until May 24, 1987.

#### i) Remedial Action

Union Carbide does not dispute that the closure plan approved by the EPD in Decem-

**2.** The terms "remove" or "removal" means (sic) the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary (sic) taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access.... 42 U.S.C. § 9601(23).

The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances or contaminated materials.... 42 U.S.C. § 9601(24).

ber, 1986 was a remedial action. Indeed, it must be a remedial action in order for Union Carbide to benefit from the 6–year statute of limitations. This 6–year statute began to run at the initiation of physical on-site construction at the landfill.

ii) Physical On–Site Construction

■ The Court can find very little guidance in determining when physical on-site construction of a remedial action begins. Union Carbide points to a proposed "Cost Recovery Rule" of the EPA which states:

> The term "physical on-site construction" for remedial actions is limited to actions that occur after completion of the remedial design and issuance of the Notice to Proceed on which remedial action personnel are authorized to begin remedial construction activities.

57 Fed.Reg. 34742, 34752(b) (Aug. 6, 1992). This is, however, a proposed rule and one intended to apply only to actions by the United States. As such, it is of no precedential value, although it seems to reflect the concept of a remedial action within the National Contingency Plan. 40 C.F.R. 300.420–300.435 (1990). The language of the statute, then, must be given its plain meaning.

Thiokol argues that several Union Carbide actions taken prior to May 24, 1987, constitute physical on-site construction of a remedial action. These include the 1981 "closure" of the landfill, the 1985 cleanup actions, and the February and March, 1987, installation of a steel fence, and collection and relocation of species of concern at the landfill, which were listed in Union Carbide's final closure plan.

Union Carbide maintains, however, that physical on-site construction of the remedial action at the landfill did not begin until June of 1987 when notice to proceed with the installation of the clay cap on the landfill was given to the contractor.

The Court does not reach the issue of whether the 1981 and 1985 procedures were

removal or remedial actions because it finds that the building of the fence at the landfill in February and March of 1987 constitutes physical on-site construction of a remedial action. It was the first element of the final closure plan submitted to the EPD by Union Carbide, dated June 20, 1986, listed as one of the "major components of closure." (p. 8) In the closure certification submitted by Union Carbide on July 13, 1988, construction of a steel fence is listed as the first component of closure at the landfill. (p. 2)

Building a steel fence falls within the ordinary meaning of "physical on-site construction," and it clearly was considered part of the remedial action by Union Carbide. Even if the purpose of the fence was to keep animals out of the landfill in anticipation of installing the clay cap, it was an "action consistent with a permanent remedy," 42 U.S.C. § 9601(24), as an integral step in the final closure process. Using the standard of the EPA's proposed "Cost Recovery Rule" favored by Plaintiff still produces a finding that the building of the fence constitutes physical on-site construction of the remedial action which occurred after the remedial plan was completed and the Notice to Proceed had been issued by the EPD on December 31, 1986.

Since the initiation of physical on-site construction at the landfill began in February of 1987, the statute of limitations on Union Carbide's CERCLA claim for that remedial action expired prior to the filing of this lawsuit. Thus, summary judgment for the Defendant is appropriate on recovery of costs and contribution for the cleanup of the landfill.

b. *The Solid Waste Management Units (SWMUs)*

■ The question remains, however, whether the SWMUs were a part of the remedial action at the landfill and, thus, subject to the same statute of limitations or whether they constitute separate facilities[3] subject to a separate statute of limitations.

---

3. CERCLA defines a facility as

(A) any building, structure, installation, equipment, pipe or pipeline ... well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or

(B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located....
42 U.S.C. § 9601(9).

CERCLA is singularly unhelpful in determining what constitutes a "site" or "facility". By its very definition, a facility can be a storage container or an entire landfill. An operable unit of a facility is defined as "a discrete action that comprises an incremental step toward comprehensively addressing site problems." 40 C.F.R. § 300.5 (1993). Clearly, it would be ridiculous to say that each barrel in a landfill is a separate facility. It is less clear, however, that all hazardous waste on 3000 acres of property, of varying origin, location and level of risk, should be considered one facility under CERCLA.

The SWMUs were not treated as "operable units" of the remedial action at the landfill, but rather as a separate environmental problem. The only discussion of the SWMUs in the closure plans for the landfill is in a post-closure report which required that all potential RCRA facilities at the Woodbine site be listed. A hazardous waste permit issued for the landfill after closure, in fact, requires that RFI/RFA work be *started* on the SWMUs. Additionally, while remedial action has been substantially completed at the landfill, all the work done on the SWMUs to this point has been removal rather than remediation.

Furthermore, the SWMUs contain many different types of wastes, whereas the landfill is primarily contaminated by Temik/aldicarb fines. The SWMUs are scattered throughout the Woodbine site. Three are relatively close to the landfill, while the other four are more distant from the landfill.

Because the SWMUs are geographically distinct from the landfill, contain a variety of wastes that were not present in the landfill, may require different removal and remedial actions than the landfill, and were not treated as part of a unitary CERCLA facility with the landfill, the SWMUs should be considered separate facilities from the landfill under CERCLA.

As separate facilities under CERCLA, the SWMUs are subject to a different statute of limitations from that applicable to the landfill. Up until this point, cleanup activities at the SWMUs have consisted of removing surface debris and conducting RFA/RFI studies. Both of these are removal rather than reme-

dial actions. 42 U.S.C. § 9601(23) ( ... such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances....); *see Marriott Corp. v. Simkins Indus., Inc.*, 825 F.Supp. 1575 (S.D.Fla.1993); *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836 (6th Cir.1994).

The statute of limitations for removal actions is three years from the date of *completion* of the removal. 42 U.S.C. § 9613(g)(2)(A). (Emphasis added.) The Court need not determine when or if the removal action for the SWMUs was completed, because the earliest possible date would be the March, 1992 RFI. This puts the filing of the case on May 24, 1993, well within the three year statute of limitations. The Court, therefore, holds that the actions for recovery of costs and contribution for the SWMUs were timely filed.

## 2. CERCLA Liability

Count I of Union Carbide's amended complaint is for cost recovery under § 107 of CERCLA. 42 U.S.C. § 9607. There are cross-motions for summary judgment on this issue. As discussed above, summary judgment will be granted for Defendant on cost recovery for the landfill. The remaining issue is cost recovery for the SWMUs.

In order to make a prima facie showing of liability for response costs under § 107, a plaintiff must show:

(1) that the defendant is within one of four statutory categories of "covered persons" liable for such costs;

(2) that there has been a release or there is a *threat* of release of a hazardous substance from a facility;

(3) which has caused plaintiff to incur clean-up and response costs;

(4) that the costs expended were necessary; *and*

(5) that the responsive actions taken and the costs incurred were consistent with the National Contingency Plan.

*Jordan v. Southern Wood Piedmont Co.*, 805 F.Supp. 1575, 1578–79 (S.D.Ga.1992) (emphasis in original) (citations omitted).[4]

It is clear that Thiokol was the owner and operator of a facility within the meaning of the statute at the time hazardous substances were disposed there, that there has been a release or threat of release of these substances, and that Union Carbide has incurred response costs. Union Carbide and Thiokol dispute, however, the necessity of Union Carbide's actions and the consistency of these actions with the National Contingency Plan ("NCP").

### a. *Necessary Response Costs*

#### i) RCRA Costs and "Ordinary Business Expenses"

■ CERCLA provides for recovery of any necessary costs of response incurred by any person that are consistent with the national contingency plan. 42 U.S.C. § 9607(a)(4)(B). Costs arising from RCRA compliance can be recovered in a CERCLA action. "The overwhelming evidence is that Congress intended CERCLA to be cumulative and not merely an alternative to RCRA or to be limited in its application to formally designated Superfund sites." *United States v. Rohm and Haas Co.*, 790 F.Supp. 1255, 1262 (E.D.Pa.1992), *rev'd on other grounds*, 2 F.3d 1265 (1993); *see also Mardan Corp. v. C.G.C. Music, Ltd.*, 600 F.Supp. 1049, 1054 (D.Ariz.1984) ("RCRA compliance costs may also be considered 'response costs' under CERCLA"); *cf. Artesian Water Co. v. Gov't of New Castle County*, 659 F.Supp. 1269 (D.Del.1987), *aff'd* 851 F.2d 643 (3d Cir.1988) (holding that monitoring and evaluation costs are necessary response costs, in contrast to

cost of damage to natural resources). The cost of the RCRA Facility Assessment and RCRA Facility Investigation performed on the SWMUs may be recovered under CERCLA since they were incurred in response to a release or threatened release of a hazardous substance.

Thiokol argues that the costs incurred by Union Carbide in compliance with minimum legal requirements for closure or cleanup of the waste management units are routine business expenses and, thus, cannot be response costs under CERCLA. The fact that Union Carbide is required by state or federal law to comply with certain procedures at the SWMUs does not remove Thiokol's CERCLA liability. The statutory language is unambiguous: "[N]otwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section," the owner of a facility at the time hazardous substances were disposed of shall be liable for any necessary costs of response. 42 U.S.C. § 9607(a). This language "specifically supersedes laws that would frustrate the purpose of CERCLA and relieve an otherwise responsible party from liability." *AM Properties Corp. v. GTE Products Corp.*, 844 F.Supp. 1007, 1012 (D.N.J.1994).

Because Thiokol has failed to raise any genuine issue of material fact showing that the monitoring and assessment activities of Union Carbide were unnecessary, and since Union Carbide has shown that the monitoring and assessment was undertaken in accordance with a RCRA compliance scheme, the Court finds that these response costs were necessary response costs under CERCLA.

---

4. Courts are split on the necessity of establishing consistency with the National Contingency Plan (NCP) at the liability phase of a CERCLA action. Some courts have held that consistency of the plaintiff's actions with the NCP is an issue of damages rather than liability, while others have held that the plaintiff need only show that some of its actions were consistent with the NCP in order to prove the defendant's liability. *See generally* William B. Johnson, Annotation, *Application of Requirement in § 107(a) of Comprehensive Environmental Response, Compensation, and Liability Act (42 USCS § 9607(a)) that Private Cost Recovery Actions Be Consistent with National*

*Contingency Plan*, 107 A.L.R.Fed. 562 (1992). Although the Eleventh Circuit has never ruled directly on this issue, Judge Bowen used consistency with the NCP as the fifth step in a prima facie case of CERCLA liability in *Jordan*, and Judge Owens, discussing consistency with the NCP as an issue of damages in *government* CERCLA suits, states in a footnote: "[T]his contrasts with private recovery actions in which a private party must show that incurred costs are consistent with the NCP in establishing liability." *U.S. v. Amtreco, Inc.*, 809 F.Supp. 959, 967 n. 7 (M.D.Ga.1992).

ii) Attorneys' Fees Under CERCLA

■ Union Carbide has included attorneys's fees in its enumerated response costs. Attorneys' fees associated with bringing a cost recovery action under CERCLA are not recoverable as necessary response costs. *Key Tronic Corp. v. United States,* —— U.S. ——, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994). Only those attorneys' fees for "work that is closely tied to the actual cleanup" may be recovered under § 107 of CERCLA. *Id.,* —— U.S. at ——, 114 S.Ct. at 1968, 128 L.Ed.2d at 807. Since Union Carbide has not introduced evidence that any of the attorneys' fees claimed were part of the actual cleanup costs (such as research to identify other potentially responsible parties), rather than costs of litigation, Thiokol's motion for summary judgment on the issue of attorneys' fees is granted.

b. *Consistency With The National Contingency Plan*

■ In order to be recoverable, necessary response costs must also be consistent with the National Contingency Plan. There are different standards for consistency with the NCP for initial investigatory costs and for cleanup costs. *Marriott,* 825 F.Supp. at 1583.

Courts that have addressed the issue of investigatory costs' consistency with the NCP are in agreement that these costs are recoverable irrespective of their consistency with the NCP. This is because "the detailed NCP provisions governing other response actions cannot reasonably be applied to preliminary monitoring and evaluation of a release of hazardous substances."

*Id.* at 1583 (footnote omitted) (citing *Artesian Water,* 659 F.Supp. at 1294); *see City of New York v. Chemical Waste Disposal Corp.,* 836 F.Supp. 968, 980 (E.D.N.Y.1993). Union Carbide has thus made a prima facie showing of liability against Thiokol for investigatory costs at the SWMUs up to this point, and summary judgment is appropriate in favor of Plaintiff on this issue.

■ Additionally, Union Carbide seeks a finding of liability against Thiokol for future remedial action at the SWMUs. These activities must be consistent with the NCP in order for Thiokol to be held liable. Because the NCP is a complex set of requirements, it is necessary for the Court to have a full factual record before it in order to determine which remedial actions are consistent with the NCP. *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 794 (D.N.J.1989). Since Union Carbide has not yet undertaken any remedial action on the SWMUs, the Court will deny summary judgment for both parties on this issue.

c. *Equitable Defenses Under CERCLA*

■ Thiokol has raised the equitable defense of laches to Union Carbide's CERCLA claims. There are only a few statutorily defined defenses to liability under CERCLA. 42 U.S.C. § 9607(b). While courts are split on the availability of equitable defenses in a cost recovery action under CERCLA, the Court is persuaded by the reasoning of Judge Owens of the Middle District of Georgia that equitable defenses are not available in § 107 cases. *United States v. Amtreco, Inc.,* 809 F.Supp. 959 (M.D.Ga.1992); *see also United States v. Smuggler–Durant Mining Corp.,* 823 F.Supp. 873 (D.Colo.1993); *United States v. Davis,* 794 F.Supp. 67 (D.R.I.1992). Therefore, Thiokol may not assert a defense of laches to a finding of liability under § 107 of CERCLA.

On cross-motions for summary judgment on Count I of Union Carbide's complaint, summary judgment will be granted in part for Thiokol on liability for cost recovery for the landfill and on recoverability of attorneys' fees under CERCLA. Summary judgment will be granted in part for Union Carbide on liability for its investigatory costs at the SWMUs up to this point and on availability of equitable defenses to a cost recovery action under CERCLA. Summary judgment will be denied in part to both parties on liability for future response costs at the SWMUs.

**3. CERCLA Contribution**

Count II of Union Carbide's amended complaint is for contribution under § 113 of CERCLA. Thiokol has moved for summary

judgment on this count, because a contribution action may only be brought against a person who is liable or potentially liable under § 107 of CERCLA. Summary judgment for Thiokol on Count II will be granted in part and denied in part. Thiokol is not liable under § 107 for the cleanup of the landfill, as discussed above. Summary judgment in Thiokol's favor on contribution for the landfill is appropriate. However, Thiokol is or may be liable under § 107 for the cleanup of the SWMUs. Summary judgment on that issue will be denied.

### 4. Declaratory Relief

Count III of Union Carbide's amended complaint is for declaratory relief under § 113 of CERCLA, which states that "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). Because such a declaration will be appropriate if Thiokol is held liable under § 107 at trial, see Amcast Indus. Corp. v. Detrex Corp., 822 F.Supp. 545, 555 (N.D.Ind.1992), aff'd in part, rev'd in part, 2 F.3d 746 (7th Cir.1993), cert. denied — U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994), Thiokol's motion for summary judgment on this count will be denied.

### B. Contract Claims

In addition to the CERCLA claims, there are two separate contract issues in this case. First, Count IV of Union Carbide's amended complaint seeks contractual indemnification by Thiokol under the terms of the 1971 Toll-Processing Agreement ("Processing Agreement"). Second, Thiokol asserts as a defense to all of Union Carbide's claims that Union Carbide's claims are barred by the terms of the Asset Purchase Agreement in 1976 ("Purchase Agreement").

The Court will address Thiokol's contractual defense on motion for summary judgment because contract interpretation in this case is a matter of law ripe for summary judgment, see Hatco Corp. v. W.R. Grace and Co., 801 F.Supp. 1309, 1318 (D.N.J.1992) (finding summary judgment appropriate be-

cause interpretation of contract was question of law, and extrinsic evidence was, for the most part, irrelevant in similar CERCLA case), and both parties have briefed the issue. The Court notes, however, that Union Carbide did not claim contractual indemnity under the Purchase Agreement in its amended complaint, even though both parties have, at times, treated this issue as if it were raised in the complaint.

Preliminarily, the Court finds that a contract of indemnity which predates CERCLA, as both the Processing Agreement and Purchase Agreement do, may be effective to indemnify one party against CERCLA liability; see, e.g., Hatco, 801 F.Supp. at 1317–18; Kerr–McGee Chem. Corp. v. Lefton Iron & Metal Co., 14 F.3d 321, 327 (7th Cir.1994); Beazer East, Inc. v. The Mead Corp., 34 F.3d 206 (3d Cir.1994); and that the application of a private contract's indemnity provision to CERCLA liability is governed by state, rather than federal, law. Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10 (2d Cir.1993); Beazer, 34 F.3d at 211; John S. Boyd Co., Inc. v. Boston Gas Co., 992 F.2d 401, 406 (1st Cir. 1993) ("The majority of courts have turned to state contract law to provide the substantive rule, so long as it is not hostile to the federal interests animating CERCLA."); Mardan Corp. v. C.G.C. Music, Ltd., 804 F.2d 1454 (9th Cir.1986); see also Hudson Ins. Co. v. American Elec. Corp., 957 F.2d 826 (11th Cir.1992), cert. denied — U.S. ——, 113 S.Ct. 411, 121 L.Ed.2d 336 (1992) (finding dispute over insurance coverage of CERCLA liability governed by state law).

### 1. Indemnification Under Toll-Processing Agreement

Thiokol seeks summary judgment on Union Carbide's claim of contractual indemnity under the terms of the Processing Agreement. The Processing Agreement contains a choice of law provision in Article 32, stating that the interpretation and performance of the contract are to be governed by New York law. Georgia will generally recognize the parties' choice of governing law in a contract, so long as the chosen law is not contrary to Georgia public policy. Myers v.

*Texaco Refining and Marketing, Inc.,* 205 Ga.App. 292, 422 S.E.2d 216 (1992), *cert. denied* 205 Ga.App. 901 (1992); *Manderson and Assoc., Inc. v. Gore,* 193 Ga.App. 723, 389 S.E.2d 251 (1989), *cert. denied* 193 Ga. App. 910 (1990). Since New York law on construction of contracts is similar to that of Georgia,[5] the Court finds that a Georgia court would give effect to the parties' choice of New York law in interpreting the contract.

■ The Processing Agreement states in Article 24(c):

THIOKOL shall indemnify UNION CARBIDE against any and all loss, liability, damage and expense of every character whatsoever sustained by any person, firm, or corporation whatsoever, including THIOKOL and its employees and UNION CARBIDE, but excluding its employees (1) caused by, arising out of, or in any way connected with acts or omissions of THIOKOL or any of its officers, agents, servants or employees in connection with the receiving, handling, storage, or manufacture at the Plant of TECHNICAL [Temik/Aldicarb], Substrates or packaging materials after delivery thereof to THIOKOL at its Plant or (2) caused by, arising out of, or in any way connected with acts, or omissions of THIOKOL, or of any of its officers, agents, servants or employees in connection with the production, handling, storage, and loading at the Plant or at its storage facilities prior to delivery by THIOKOL to carrier of Product and Recovered Acetone hereunder. . . .

Thiokol argues that this indemnification is barred by the later written purchase agreement between the parties.

Section 8(h) of the Purchase Agreement purports to cancel the Processing Agreement, except that "any remaining obligations between the parties relating to said [processing] agreement shall be agreed to in writing." On November 15, 1976, the same day the Purchase Agreement was signed, the parties agreed to add "Amendment 23" to the Processing Agreement. It makes the following changes to the Processing Agreement:

1. Delete Article 1 in its entirety and substitute the following therefore: "This Amendment shall commence as of the date first above written and shall continue in effect until November 15, 1976."

2. In complete discharge of all remaining fees, payments and compensation due Thiokol under Article 13, whether billed or unbilled, Union Carbide will pay to Thiokol, within thirty (30) days after receipt of invoice, the total sum of $63,444.86. In addition, outstanding invoices per the attached list will be paid by Union Carbide in due course.

3. Except as herein modified, all terms and conditions of our said Agreement shall remain unchanged.

The original Processing Agreement included Article 21, a survival clause, which stated that "The rights, licenses and obligations of UNION CARBIDE and THIOKOL under ARTICLES 16, 17, 19 and 20 hereof shall survive the termination of this Agreement." These articles discussed the duty of Thiokol and its employees not to reveal confidential information, drawings, plans, technology or patents, and stated that Union Carbide would own all patents and technology related to Aldicarb production.

Union Carbide maintains that Amendment 23 supersedes the survival clause in the Processing Agreement. Because Amendment 23 left intact all "terms and conditions" of the Processing Agreement except the date on

---

5. Under New York law, for example, "indemnification agreements are strictly construed; a court cannot find a duty to indemnify absent manifestation of a 'clear and unmistakable intent' to indemnify." *Commander Oil Corp. v. Advance Food Service Equipment,* 991 F.2d 49, 51 (2d Cir.1993) (quoting *Heimbach v. Metropolitan Transport. Auth.,* 75 N.Y.2d 387, 553 N.Y.S.2d 653, 657, 553 N.E.2d 242, 246 (N.Y.1990).

In Georgia,

[A] contract of indemnification is construed strictly against the indemnitee. *Foster v. Nix,* 173 Ga.App. 720, 724(1), 327 S.E.2d 833 (1985). "In the absence of explicit language to the contrary, courts will not interpret an indemnity agreement as a promise by the indemnitor to save the indemnitee harmless on account of the latter's own negligence." *Batson–Cook Co. v. Ga. Marble, etc., Co.,* 112 Ga.App. 226, 230, 144 S.E.2d 547 (1965).

*Westinghouse Elec. Corp. v. Williams,* 183 Ga. App. 845, 847, 360 S.E.2d 411 (Ga.Ct.App.1987), *cert. denied* (Dec. 1, 1987).

which it was canceled, the indemnity survived the termination of the Processing Agreement. Thiokol argues that the Processing Agreement is canceled by § 8(h) of the Purchase Agreement. Since Article 24 of the Processing Agreement, which contained the indemnity, was not one of the articles which would survive the termination of the Processing Agreement, there is no indemnity. Alternatively, Thiokol claims that, even if the indemnity in the Processing Agreement remained in effect after the Processing Agreement ended on November 15, 1976, it was subject to an 18 month survival clause in the Purchase Agreement and, thus, expired on May 15, 1978. Section 14 of the Purchase Agreement limits the survival of all "representations, warranties and agreements" in the Purchase Agreement, or made pursuant thereto, to 18 months after the signing.

■ Under New York contract law, the Court must effectuate the intent of the parties as revealed by the contract language. *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir.1992) (citing *Slatt v. Slatt*, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099 (N.Y.1985)).

When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity. Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate, since it is only when there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law.

*Id.* (citations omitted).

■ Contract language is ambiguous if it can reasonably be given more than one interpretation. The court determines ambiguity based only on the terms of the contract, not extrinsic evidence. *Burger King Corp. v. Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir.1990). "Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in litigation." *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989).

There is ambiguous language about which reasonable minds could disagree in the contract. The most obvious ambiguity is in Amendment 23, which states that "all terms and conditions" of the Processing Agreement remain unchanged. There is no guidance in the contract to indicate whether this means that all provisions of the contract are still in effect as if the contract had not been terminated, or whether this means that, recognizing that the contract has been terminated, the provisions of the contract are in effect subject to that termination; i.e., the survival clause has been triggered. Extrinsic evidence of the parties' intent will be necessary to determine which interpretation is correct. *See Commander Oil Corp. v. Advance Food Service Equipment*, 991 F.2d 49, 55 (2d Cir. 1993) (precluding summary judgment because language of contract, when read in connection with contemporaneous contract, was ambiguous as a matter of law. It "does not afford 'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion.'") (quoting *Hunt*).

■ The issue of whether the Processing Agreement is subject to the 18–month survival clause of the Purchase Agreement also rests on the intent of the parties. The general rule is that separate contracts dealing with the same subject matter and executed at the same time may be read together, but only if the parties so intended. *Williams v. Mobil Oil Corp.*, 83 A.D.2d 434, 445 N.Y.S.2d 172, 175 (N.Y.A.D.1981). "Whether the parties intended that the two agreements should be interdependent is a question of fact which turns upon the circumstances of each case." *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Turtur*, 892 F.2d 199, 204 (2d Cir. 1989).

Here, there is little indication within the four corners of either contract what the intent of the parties was. The Purchase Agreement mentions that the Processing

Agreement will end, but that it may still be changed in writing by the parties. The Processing Agreement was amended with no mention of the Purchase Agreement. The trier of fact will need to resolve the question of the parties' intent through extrinsic evidence.

Considering the evidence in the light most favorable to Union Carbide, the nonmoving party, the Court finds that genuine issues of material fact remain concerning indemnification under the Processing Agreement, and that a trier of fact must consider extrinsic evidence to determine the intent of the parties respecting the contract terms. Summary judgment for Thiokol on this issue will be denied.

### 2. Indemnification Under Asset Purchase Agreement

 The terms of the Asset Purchase Agreement are also at issue. Since the Purchase Agreement does not contain a choice of law provision, Georgia law applies. In interpreting contracts, Georgia uses *lex loci contractus,* or the law of the place where the contract was made. *Ferrero v. Associated Materials Inc.,* 923 F.2d 1441 (11th Cir.1991). A contract is considered made where it is delivered rather than where it is executed. *Continental Cas. Co. v. Synalloy Corp.,* 667 F.Supp. 1523 (S.D.Ga.1983); *Float–Away Door Co. v. Continental Cas. Co.,* 372 F.2d 701 (5th Cir.1966), *cert. denied* 389 U.S. 823, 88 S.Ct. 58, 19 L.Ed.2d 76 (1967). The Purchase Agreement appears to have been executed and delivered in New York, so the Court finds that a Georgia court would apply the law of New York in interpreting this contract as well.

 Section 10 of the Purchase Agreement between Union Carbide and Thiokol provided that Thiokol would indemnify Union Carbide for "any and all losses, damages, claims, or expenses based upon the conduct of the Seller of its business at the Facility at any time." Section 14 of the Purchase Agreement, however, limits the survival of all "representations, warranties and agreements" in the Purchase Agreement, or made pursuant to it, to 18 months after the signing. The indemnification clause is a representation, warranty or agreement in the Purchase Agreement.[6] Thus, the clear meaning of the contract language is to limit contractual indemnification of Union Carbide by Thiokol to 18 months. *See Pierson Sand & Gravel, Inc. v. Pierson Township,* 851 F.Supp. 850, 858 (W.D.Mich.1994) (holding that indemnity provision in asset purchase agreement was "agreement" subject to survival clause for "representations, warranties and agreements contained in this Agreement.").

 Thiokol argues that the expiration of the indemnity clause in the Purchase Agreement not only prevents Union Carbide from asserting a contractual indemnity claim, but also serves to shift *all* liability for environmental costs to Union Carbide. This is inconsistent with the requirement that, in order for parties to allocate CERCLA liability between themselves, there must be an express written agreement, which is strictly construed when one of the parties is seeking to indemnify itself from its own actions. *Hatco,* 801 F.Supp. at 1318; *see also Commander Oil,* 991 F.2d at 51 ("in New York indemnification agreements are strictly construed; a court cannot find a duty to indemnify absent manifestation of a 'clear and unmistakable intent' to indemnify.") (quoting *Heimbach v. Metropolitan Transport. Auth.,* 75 N.Y.2d 387, 553 N.Y.S.2d 653, 657, 553 N.E.2d 242, 246 (N.Y.1990)).

"For an agreement to indemnify against CERCLA liabilities, an intent to that affect

---

6. Union Carbide has argued that the indemnity provision is not a representation, warranty or agreement for purposes of the survival clause, because the Agreement sets out the representations, warranties and covenants of the parties in §§ 4, 5 and 6, and the indemnity provision in § 10 is not called a representation, warranty or agreement. The Court finds, however, that "representations, warranties and agreements" are used in their general sense rather than as terms of art. Section 14 says "All statements contained in any certificate or other instrument delivered by or on behalf of Seller or Buyer, respectively, pursuant to this Agreement shall be deemed representations and warranties hereunder by Seller or Buyer, as the case may be." The plain meaning of the survival clause is that all terms agreed to by the parties in the Purchase Agreement are subject to the survival clause.

(sic) must be clearly expressed. This rule is simple: No clear expression, no indemnity." *Hatco* at 1321. In the present case, § 3 of the Agreement states:

> Buyer shall be under no liability whatsoever for debts, liabilities or obligations of Seller incurred either before or after the closing or arising out of transactions by Seller or events occurring with respect to Seller either before or after the closing, except for those obligations and liabilities of Seller assumed by Buyer pursuant to the provisions of paragraph (a) of Section 2 of this Agreement.

None of the liabilities assumed by Union Carbide was environmental. The unambiguous meaning of this language is that Thiokol retains all its environmental liabilities. Thus, reading all provisions of the contract together, there is no clear expression of an intent to release Thiokol from all CERCLA claims.

In *Southland Corp. v. Ashland Oil, Inc.*, 696 F.Supp. 994 (D.N.J.1988), the parties had an almost identical indemnity clause and survival provision, limiting survival to two years, in their sale contract.

> The court determined that this limitations period barred only breach of contract claims based on indemnity and failure to remove hazardous waste. Elimination of these breach of contract claims did not "convert the remaining contractual language into an express assumption of liability for all hazardous waste cleanup costs by Southland." Plaintiff's statutory contribution rights under CERCLA were preserved because there was no "clear transfer or release of future 'CERCLA-like' liabilities."

*Mobay Corp. v. Allied–Signal, Inc.*, 761 F.Supp. 345, 357 (D.N.J.1991) (quoting *Southland*, 696 F.Supp. at 1002) (citations omitted). *Cf. Armotek Industries, Inc. v. Freedman*, 790 F.Supp. 383, 392 (D.Conn. 1992) (concluding that, where agreement refers to "environmental laws, regulations and ordinances relating to treatment, disposal and removal of liquid, solid and gaseous wastes," there was specific allocation of risk sufficient to transfer liability under CERCLA).

Because there is no indication in the language of the Purchase Agreement of any transfer or release of any environmental liabilities, liability for Thiokol's environmental actions prior to the Agreement remains with the original holder, Thiokol. Thus, while Union Carbide is no longer indemnified by the Purchase Agreement, none of its CERCLA claims is barred by the Agreement.

## C. *Common Law Claims*

Counts V and VI of Union Carbide's amended complaint seek common law indemnification and contribution from Thiokol. Thiokol has moved for summary judgment on both counts.

■ Contribution and indemnity are similar remedies. They are available to one joint tortfeasor against another when both are responsible for an underlying tortious action. Which remedy is appropriate depends on the parties' negligence. "If it may be demonstrated that one party was actively negligent in the face of the other party's passive negligence, an action for indemnity lies. If both parties are demonstrably negligent but no apportionment of relative negligence may be made, the claim is one for contribution." *Crockett v. Uniroyal, Inc.*, 772 F.2d 1524, 1530–31 (11th Cir.1985) (citing *Colt Industries Operating Corp. v. Coleman*, 246 Ga. 559, 560, 272 S.E.2d 251 (Ga.1980)).

■ In an action for contribution or indemnity, the parties must be joint tortfeasors, and one party must have paid more than its share of a joint burden to a third party. Thiokol makes three arguments on motion for summary judgment: first, that there is no legal burden incurred by Union Carbide; second, that Thiokol is not a joint tortfeasor; and, third, that the statute of limitations has run on any claim Union Carbide might have.

Under O.C.G.A. § 51–12–32, there need not be a legal adjudication of rights for a party to assert a claim for contribution or indemnity. There is "a right of contribution where there is no judgment at all in the underlying suit, and even where there is no

underlying suit filed." *Marchman & Sons, Inc. v. Nelson,* 251 Ga. 475, 477, 306 S.E.2d 290 (Ga.Ct.App.1983) (holding that dismissal with prejudice of underlying suit is not bar to action for contribution). A tortfeasor who enters a settlement agreement with the tort victim may then seek contribution or indemnity from a joint tortfeasor who was not a party to the suit or the settlement. O.C.G.A. § 51–12–32(a) and (c); *Seaboard Coast Line R.R. v. Mobil Chemical Co.,* 172 Ga.App. 543, 323 S.E.2d 849 (Ga.Ct.App.1984) (party may settle claims against it without prejudicing its right to seek indemnity from another negligent party).

■■■ While the Court has found no case law directly on point, Union Carbide's entry into a consent order with the DNR to clean up the Woodbine site is analogous to a settlement agreement. Thus, Union Carbide has incurred a financial burden which is not "voluntary," as Thiokol argues, any more than a settlement agreement is voluntary.

■■■ This does not mean that Union Carbide need not prove that Thiokol was a joint tortfeasor. Thiokol asserts that, under Georgia environmental law, only Union Carbide as the current owner of the site has a legal duty to clean up any hazardous conditions on the site. Even if Thiokol has no duty under the environmental statutes, it can still be a joint tortfeasor if it acted negligently. If Thiokol was negligent, then the nature of Union Carbide's actions would also have to be defined in order to determine whether an action for contribution or for indemnity is appropriate. Since negligence is generally a question for the trier of fact, the Court at this time will deny summary judgment on Union Carbide's claims for contribution and indemnity.

■■■ Actions for contribution and indemnity are governed by a 20–year statute of limitations under O.C.G.A. § 9–3–22, not a four-year statute of limitations, as argued by Thiokol. *Krasaeath v. Parker,* 212 Ga.App. 525, 441 S.E.2d 868 (Ga.Ct.App.1994) (dicta), *cert. denied* (May 13, 1994) (citing *Independent Mfg. Co., Inc. v. Automotive Products,*

*Inc.,* 141 Ga.App. 518, 233 S.E.2d 874 (Ga.Ct. App.1977) and *Champion v. Wells,* 139 Ga. App. 759, 229 S.E.2d 479 (1976), both decided under the predecessor to § 9–3–22). Thus, Union Carbide's claims are not barred by the statute of limitations.

■■■ Thiokol asserts that Union Carbide's contractual and common law claims should be barred by the doctrine of laches. Laches is not established merely by the passage of time. The party asserting it must show that there has been an unreasonable delay, creating substantial prejudice to that party. *E.E.O.C. v. Firestone Tire and Rubber Co.,* 626 F.Supp. 90 (M.D.Ga.1985); *Hodges v. Libbey,* 224 Ga. 509, 162 S.E.2d 716 (Ga.1968) (giving factors to be considered in determining existence of laches). Genuine issues of material fact, precluding summary judgment, remain as to whether there has been an unreasonable delay by Union Carbide and whether there has been substantial prejudice to Thiokol.

### D. *Counterclaims*

Thiokol has moved for summary judgment on its three CERCLA counterclaims as well. Count I seeks CERCLA § 107 cost recovery against Union Carbide, Count II seeks CERCLA § 113 contribution from Union Carbide, and Count III seeks declaratory relief. For the following reasons, summary judgment on all three claims will be denied.

■■■ Thiokol has failed to make out a prima facie case of liability under § 107. While Union Carbide is a statutorily "covered person," and there has been a release or threatened release of a hazardous substance, Thiokol has not described its response costs, or demonstrated that they are necessary or consistent with the NCP. Summary judgment will be denied on Count I.

Because § 107 liability is a prerequisite for a § 113 contribution claim, Thiokol is not entitled to summary judgment on Count II. Declaratory relief is also premised on § 107 liability. Summary judgment on Count III is inappropriate at this time.

*CONCLUSION*

For the foregoing reasons, summary judgment for Union Carbide is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment for Thiokol is **GRANTED IN PART** and **DENIED IN PART**.

On Count I of Union Carbide's complaint, summary judgment is **GRANTED** for Thiokol on liability for cost recovery for the landfill and recoverability of attorneys' fees under CERCLA. Summary judgment is **GRANTED** for Union Carbide on liability for its investigatory costs at the SWMUs up to this point and on availability of equitable defenses to a cost recovery action under CERCLA. Summary judgment is **DENIED** to both parties on liability for future response costs at the SWMUs.

On Count II, summary judgment is **GRANTED** to Thiokol on contribution for the landfill and **DENIED** on contribution for the SWMUs. On Counts III, IV, V, and VI, summary judgment for Thiokol is **DENIED**.

On Thiokol's counterclaim, summary judgment is **DENIED** on Counts I, II, and III.

**SO ORDERED.**

*ORDER*

On May 24, 1993, Plaintiff, Union Carbide Corp. ("Union Carbide"), filed a federal question action against Defendants/Third Party Plaintiffs, Thiokol Corp., Morton International, Inc., and Morton Thiokol, Inc. (collectively, "Thiokol"), seeking to recover costs incurred in cleaning up hazardous waste at a site in Woodbine, Georgia, owned by Union Carbide and previously owned by Thiokol. Union Carbide's claims are brought under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq. ("CERCLA"), contract provisions, and common law principles of contribution and indemnity. Thiokol counterclaimed to recover its cleanup costs under CERCLA and common law contribution and indemnity. Rhone–Poulenc was later added by Thiokol as a Third Party Defendant.

This case was previously before the Court on two motions for summary judgment: a motion filed by Defendant, Thiokol, requesting summary judgment on all counts of Union Carbide's amended complaint and on counts I, II, and III of Thiokol's counterclaim; and a motion filed by Plaintiff, Union Carbide, for partial summary judgment on the issue of Thiokol's liability under section 107 of CERCLA. Summary judgment for Thiokol was granted in part and denied in part, and summary judgment for Union Carbide was granted in part and denied in part. Summary judgment was denied on Thiokol's counterclaim.

On September 21, 1994, Union Carbide and Rhone–Poulenc moved for summary judgment on Thiokol's counterclaim and third party complaint, asserting that Thiokol has not incurred any CERCLA response costs as a matter of law. Thiokol responded with a motion to strike Union Carbide's motion for summary judgment on the grounds that it is barred by a consent scheduling order prohibiting the filing of any summary judgment motions after July 6, 1994.

Upon consideration of the record, the Court finds that Union Carbide and Rhone–Poulenc, as parties to the present action, are both prevented from making any motion for summary judgment after July 6, 1994. The Court will, therefore, **STRIKE** both Union Carbide's and Rhone–Poulenc's motions for summary judgment on Thiokol's counterclaim.

**SO ORDERED.**